# United States Court of Appeals
## For the First Circuit

---

Nos. 13-1048
      13-1118

UNITED STATES OF AMERICA,

Appellee,

v.

MARC D. FOLEY,

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Torruella and Howard, Circuit Judges.

---

Rebecca A. Jacobstein, with whom Office of Appellate Advocacy was on brief, for appellant.
Ross B. Goldman, Criminal Division, Appellate Section, United States Department of Justice, with whom Carmen M. Ortiz, United States Attorney, Victor A. Wild and Veronica M. Lei, Assistant United States Attorneys, Mythili Raman, Acting Assistant Attorney General and Denis J. McInerney, Deputy Assistant Attorney General, were on brief, for appellee.

---

April 1, 2015

---

**HOWARD, Circuit Judge**.  Marc Foley appeals his conviction and sentence for 33 counts of wire fraud and five counts of money laundering arising from his role in a mortgage fraud scheme.  Foley challenges the sufficiency of the evidence as to 28 of the wire fraud counts and all of the money laundering counts, argues that the district court abused its discretion in three of its evidentiary rulings, and alleges that the prosecutor engaged in misconduct in his closing statement.  Foley also disputes the procedural and substantive reasonableness of his 72-month sentence and the district court's methodology in ordering restitution of nearly $2.2 million.  We find no error in Foley's conviction and sentence, except that we vacate in part the district court's restitution order.

## I.

At the center of this case is a 24-unit apartment building at 135 Neponset Avenue in Dorchester, Massachusetts (the "Neponset Building"), purchased and converted into a condominium form of ownership by Elizabeth (Lisa) Reed in December 2006.  Reed was the owner of Mass Lending, LLC, a mortgage brokerage firm, in which capacity she frequently worked with Foley, a real estate lawyer, on loan closings.  Foley also prepared the condominium conversion documents for the Neponset Building.

Reed financed the purchase of the Neponset Building with a short-term "hard money" loan, pursuant to which she paid a

private lender $100,000 in exchange for a ten-day loan of $2.6 million. Needing to recoup her investment at once to repay the loan, Reed took three steps to generate immediate sales of condominium units. First, she rewarded buyers with kickbacks for their purchases. Second, she directed her employees at Mass Lending to submit falsified mortgage loan applications on the buyers' behalf, misrepresenting the buyers' incomes, employment, and assets in order to obtain loans covering 90 to 95 percent of the purchase price. Third, she ensured that the buyers would not need to provide the remaining down payment at the loan closing. It was this last measure for which she once again obtained Foley's assistance.

Either Foley or his associate, Sean Robbins, served as the closing attorney and settlement agent at each of the loan closings, which took place from December 19, 2006 to January 12, 2007. In that role, Foley and Robbins were responsible for preparing HUD-1 settlement statements ("HUD-1s") -- documents certified by the buyer, seller, and settlement agent and indicating to the lender, inter alia, the amount of funds collected from the buyer at the closing.[1] Each of the 33 submitted HUD-1 forms at

---

[1] As we further elaborated in United States v. Appolon, 695 F.3d 44, 53 n.3 (1st Cir. 2012):

> The Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§ 2601-2617, requires that a HUD-1 settlement statement be used in every real estate settlement "involving a federally related mortgage loan in which

issue in this case -- seven of which were not signed by the settlement agent -- indicated that the buyer had made a down payment at the loan closing. In fact, however, no such payments were ever made.

Upon receipt of the HUD-1 forms, lenders would wire funds to Foley's Interest on Lawyers Trust Account ("IOLTA"). Foley would then disburse those funds to Reed, writing Reed a check for the amount denoted "Cash to Seller" on the HUD-1, less the amount of the buyer's supposed down payment (denoted "Cash from Borrower" on the HUD-1). To avoid potential liability to Reed over the remaining proceeds, Foley directed Reed to sign a "disbursement authorization" form for each of the loan closings, reducing Reed's sale proceeds by the amount of the purported down payment.[2] When a lender required additional proof of a buyer's down payment, Foley instructed Reed to prepare bogus checks indicating that the buyer had actually brought funds to the closing. Foley then directed his paralegal to draw a check from his IOLTA in the amount due from the borrower and to later redeposit that check as "cash from buyer,"

there is a borrower and a seller." 24 C.F.R. § 3500.8(a). Among other things, the HUD-1 form is meant to "conspicuously and clearly itemize all charges imposed upon the borrower and all charges imposed upon the seller in connection with the settlement." 12 U.S.C. § 2603.

[2] For instance, if the "cash to seller" amount was $100,000, the mortgage loan amount $75,000, and the "cash from borrower" amount $25,000, then Foley would write Reed a check for $75,000 and Reed would sign a disbursement authorization reducing her proceeds by the remaining $25,000.

creating the illusion that Foley had received money from the borrower.

Foley was charged with 33 counts of wire fraud, 18 U.S.C. § 1343, and five counts of money laundering, id. § 1957, for his role in these transactions. At trial, Foley mounted a defense of "good faith" in the face of damning testimony from Robbins and Reed, both of whom testified against him pursuant to plea agreements.[3] The crux of Foley's defense was that he honestly believed that the money would be forthcoming from the buyers and that Robbins and Reed lacked credibility. The jury, however, saw the evidence differently and found Foley guilty on all counts. The case then proceeded to sentencing, where the district court imposed a below-Guidelines sentence of 72 months' incarceration and also ordered restitution in the amount of $2,198,204. This appeal followed.

## II.

### A.    Sufficiency of the Evidence

### 1.   Wire Fraud

Foley first contends that the evidence was insufficient as to all but five of the 33 wire fraud counts. With respect to the seven counts arising from unsigned HUD-1 forms, Foley contends

_____

[3]   Reed pleaded guilty to 40 counts of wire fraud and 13 counts of money laundering, and was sentenced to 18 months' incarceration. Robbins pleaded guilty to 24 counts of misprision of a felony, 18 U.S.C. § 4, and was sentenced to eight months' home confinement.

-5-

that without a signature there was no misrepresentation and thus no wire fraud. Because two lending companies, Taylor, Bean & Whitaker and Fremont, nevertheless extended loans based on these unsigned HUD-1 forms, Foley further argues that there was also insufficient evidence as to the 21 counts involving signed HUD-1s sent to these companies, reasoning that the presence or absence of a signature was not material to the lenders' decisionmaking.

Although the parties do not dispute that Foley moved for acquittal on the wire fraud counts under Fed. R. Crim. P. 29 both at the close of the government's case and after the trial, they nevertheless disagree as to the proper standard of review for this claim. Under our precedent, although a general sufficiency-of-the-evidence objection preserves all possible sufficiency arguments, a motion raising only specific sufficiency arguments waives unenumerated arguments. United States v. Lyons, 740 F.3d 702, 716 (1st Cir. 2014); United States v. Marston, 694 F.3d 131, 134 (1st Cir. 2012). We have suggested that a general sufficiency objection accompanied by specific objections preserves all possible sufficiency objections. See Marston, 694 F.3d at 135 (finding "good reason in case of doubt" to treat such motions as general, because "[i]t is helpful to the trial judge to have specific concerns explained even where a general motion is made; and to penalize the giving of examples, which might be understood as

-6-

abandoning all other grounds, discourages defense counsel from doing so and also creates a trap for the unwary defense lawyer").

At the close of the government's case, Foley's counsel moved for judgment of acquittal on all counts.  Defense counsel then proceeded to state:  "But in reality, Judge, there is one very serious issue.  And that is the government has failed to establish that the District of Massachusetts is the proper venue for this prosecution."  Foley's post-trial motion for acquittal in turn stated that "[a] judgment of acquittal should be granted on Counts 1-33 [i.e., the wire fraud counts] as the government failed to prove proper venue in the District of Massachusetts."  Neither of these motions are the type of "general motion accompanied by examples" contemplated in Marston.  Neither motion raised any issue other than venue, and although the oral motion at the close of evidence might with some imagination be interpreted as treating venue as merely "one very serious issue" of many, the post-trial motion is not susceptible even to such liberal reading.  We therefore treat Foley's signature-based sufficiency challenge as unpreserved, and review for clear and gross injustice only.  Id. at 134; see also United States v. Upham, 168 F.3d 532, 537 (1st Cir. 1999), cert. denied, 527 U.S. 1011 (1999).  We conclude that Foley's claim fails to meet that stringent standard, which we have described as a particularly exacting variant of plain error

-7-

review,[4] although our conclusion would be the same even under traditional plain error. See United States v. Jones, 748 F.3d 64, 73 (1st Cir. 2014).

The elements of wire fraud under 18 U.S.C. § 1343 are "(1) a scheme or artifice to defraud using false or fraudulent premises; (2) the defendant's knowing or willing participation in the scheme or artifice with the intent to defraud; and (3) the use of the interstate wires in furtherance of the scheme." United States v. Appolon, 715 F.3d 362, 367 (1st Cir. 2013). The false or fraudulent representation must also be material. Id.

HUD-1 forms contain a signature block beneath the following certification by the settlement agent: "The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with the statement." By Foley's account, "the government's case was that Mr. Foley's signature was the fraud," such that the only relevant statement was "the

---

[4] See United States v. Acosta-Colón, 741 F.3d 179, 192-93 (1st Cir. 2013) ("[T]he already high bar for plain error becomes even higher when dealing with an unpreserved sufficiency-of-the-evidence claim."); United States v. Pratt, 568 F.3d 11, 18 (1st Cir. 2009) ("[T]he particularly stringent form of plain error review we apply to an unpreserved challenge to the sufficiency of the evidence asks whether the conviction resulted in a 'clear and gross injustice.'" (citation omitted)). Other circuits, however, simply "characterize the review as one for plain error only." United States v. Luciano, 329 F.3d 1, 5 n.6 (1st Cir. 2003) (citing United States v. Morgan, 238 F.3d 1180, 1186 (9th Cir. 2001); United States v. Villasenor, 236 F.3d 220, 222 (5th Cir. 2000) (per curiam)).

certification on the HUD-1 that Mr. Foley had collected cash from the buyer at the closing."[5]

The prosecution did indeed allude in both its opening and closing arguments to the significance of the settlement agent's signature, stating, e.g., that "by signing the HUD-1s for these loans, the defendant certified to the mortgage company that he did collect the funds" and that the "HUD-1 when it said I have or will disburse in accordance with this HUD-1 is patently false." Nevertheless, the government advanced a broader theory than Foley suggests. Signed or unsigned, each of the HUD-1s misrepresented the amount of "cash from borrower," falsely indicating that the borrower had brought some amount of cash to the closing when in fact no funds were ever transferred. In its closing argument, the prosecution accordingly described the HUD-1 form as

> a lie to the mortgage company when it was sent to the lender to get the funds released. It was a lie about what was collected from the borrowers, and it was a lie about what was paid to the seller. [Foley] had those false HUD-1s sent to the clients. The lenders' money was released based on those lies.

That theory was amply supported by trial evidence showing that after each closing, Robbins gave Foley's paralegal the unsigned

---

[5] Although Foley's brief focuses on the presence or absence of "Mr. Foley's signature" from the HUD-1 form, Foley does not argue that the HUD-1s signed by Sean Robbins as settlement agent were also insufficient because they did not contain Foley's signature. Rather, Foley's challenge focuses solely on the seven HUD-1s in which the signature block was left altogether blank.

HUD-1s to be sent to the lenders, which in turn accepted the forms and funded the loans.

We accordingly reject Foley's contention that the government's case rested solely on the stroke of a pen. To the extent that Foley takes issue more broadly with what he characterizes as the government's "claim[] that the mere submission of an unsigned HUD-1 to a lender can be a fraudulent misrepresentation even though there is a required certification on the form," he points to no cases imposing such a "certification" requirement under § 1343. On the contrary, we and other circuits have rejected comparable attempts to narrow the scope of analogous statutes. See United States v. Ayewoh, 627 F.3d 914, 922 (1st Cir. 2010) (interpreting identical language in the bank fraud statute, 18 U.S.C. § 1344, and holding that "the misrepresentation element of § 1344 is fulfilled by any intentional act or statement by an individual that falsely indicates, explicitly or implicitly, that he has authority to withdraw money from a bank," including the entry of a credit card number into a point-of-sale device); see also United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 390 (1st Cir. 2011) ("So long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach." (quoting United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1172 (9th Cir. 2006)) (internal

quotation marks omitted)); <u>United States</u> v. <u>Zwego</u>, 657 F.2d 248, 250 (10th Cir. 1981) (holding that 18 U.S.C. § 1014, criminalizing false statements in connection with loan and credit applications, extends to both written and oral statements); <u>United States</u> v. <u>Sackett</u>, 598 F.2d 739, 741-42 (2d Cir. 1979) (same). We therefore find no clear and gross injustice or plain error in Foley's conviction.

Foley's secondary argument that the lenders' acceptance of unsigned HUD-1s in turn demonstrates a lack of materiality as to the <u>signed</u> forms rests on the same misguided premise that the signature was the sole misrepresentation. As we have explained, both the signed and unsigned HUD-1s falsely indicated the receipt of "cash from borrower." That the loan companies were apparently willing to extend loans based on unsigned HUD-1s hardly compels the additional inference that the loans would still have been extended even without the misrepresentations as to the receipt of down payments. On the contrary, Foley himself acknowledges the testimony of three lending company employees that the loans would not have closed if the lenders had known that the "cash from borrower" was in fact never obtained. That was more than enough evidence for the jury to conclude that these misrepresentations were material to the lenders' decisions.

## 2.    Money Laundering

Foley also attacks his five money laundering convictions under 18 U.S.C. § 1957, arguing that the government failed to adduce evidence that the underlying transactions involved "criminally derived property" within the meaning of the statute. Foley concedes that he failed to renew this sufficiency challenge after trial and that our review is accordingly for clear and gross injustice only.[6]  See Marston, 694 F.3d at 134.

Section 1957 punishes individuals who "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."   18 U.S.C. § 1957(a). "Criminally derived property" is in turn defined as "any property constituting, or derived from, proceeds obtained from a criminal offense."  Id. § 1957(f)(2).  At the time of the transactions at issue here, the statute provided no definition of "proceeds."[7]  In United States v. Santos, 553 U.S. 507 (2008), a divided Supreme Court grappled with alternate definitions of "proceeds" as "receipts" versus "profits" of a crime. Citing the rule of lenity,

_____

[6]  Again, however, Foley's challenge would likewise fail under plain error.  See infra at 15.

[7]  Congress subsequently amended the statute in May 2009 to define "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity."  18 U.S.C. § 1956(c)(9); see also id. § 1957(f)(3) (incorporating § 1956's definition of "proceeds").

a plurality of the Court adopted the "profits" definition. Id. at 514 (Scalia, J., joined by Souter, Thomas, and Ginsburg, JJ.). The plurality further noted that the "receipts" interpretation would create a "merger problem" for statutes such as the illegal gambling statute, 18 U.S.C. § 1955, at issue in Santos itself: "If 'proceeds' meant 'receipts,' nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery." Id. at 515.

Justice Stevens, concurring, disagreed with the plurality's broad application of the rule of lenity and focused instead on the merger issue. With respect to the illegal gambling statute, Justice Stevens stated that "[t]he revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not 'proceeds' within the meaning of the money laundering statute," because "[a]llowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy." Id. at 528, 527 (Stevens, J., concurring). Justice Stevens suggested, however, that the Court "need not pick a single definition of 'proceeds' applicable to every unlawful activity," thereby implying that the "profits"

definition is only warranted in the context of crimes creating such merger problems.  Id. at 525.

We have suggested in dicta that Justice Stevens's narrower opinion controls, such that the definition of "proceeds" is only limited to profits where the broader "receipts" definition would give rise to a merger issue.  See United States v. García-Pastrana, 584 F.3d 351, 380 (1st Cir. 2009) (noting "some question as to the holding of Santos, since Justice Stevens, the fifth and deciding vote, suggested in concurrence that the holding may vary by offense and the legislative history," and questioning Santos's applicability to a case that did not present merger problems); United States v. Levesque, 546 F.3d 78, 82 (1st Cir. 2008) (describing Santos as limiting "proceeds" to profits "at least when the predicate offense is an illegal lottery operation"); see also, e.g., United States v. Van Alstyne, 584 F.3d 803, 814 (9th Cir. 2009) ("We therefore view the holding that commanded five votes in Santos as being that 'proceeds' means 'profits' where viewing 'proceeds' as 'receipts' would present a 'merger' problem of the kind that troubled the plurality and concurrence in Santos."); United States v. Kratt, 579 F.3d 558, 562 (6th Cir. 2009) (same). Other circuits have construed Santos even more narrowly.  See, e.g., United States v. Thornburgh, 645 F.3d 1197, 1209 (10th Cir. 2011) ("'[P]roceeds' means 'profits' for the purpose of the money laundering statute only where an illegal gambling operation is

-14-

involved."); <u>United States</u> v. <u>Demarest</u>, 570 F.3d 1232, 1242 (11th Cir. 2009) (same).

As an initial matter, given the ambiguity of <u>Santos</u>'s holding and the lack of clear guidance in our cases, we doubt that any misapplication of <u>Santos</u> by the district court rises to the level of plain error, let alone clear and gross injustice. <u>See</u> <u>Thornburgh</u>, 645 F.3d at 1209 ("[A]ssuming that <u>Santos</u> dictates that it was error in this case to not require proof of profits, that error cannot be <u>plain</u>, in view of the widely differing interpretations of <u>Santos</u>."); <u>United States</u> v. <u>Aslan</u>, 644 F.3d 526, 547-50 (7th Cir. 2011) (same). And in any event, Foley's arguments fail on their merits.

The money laundering counts against Foley were based upon the transfer of money obtained from the fraudulent loan closings. Four of the counts arose from checks drawn on Foley's IOLTA account and deposited into Elizabeth Reed's bank account; the fifth count arose from a check drawn on Foley's IOLTA account and used to make a payment on Reed's behalf to Capital Trust LLC, which had loaned Reed the money to buy the Neponset Building. Foley avers that his case implicates the merger issues contemplated by Justice Stevens in <u>Santos</u> and that "proceeds" in this case must accordingly be limited to the profits of the wire fraud scheme, but he fails to elaborate why, in his estimation, "the transferred funds were not profits." Nevertheless, even setting aside the issue of appellate

waiver, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), and accepting arquendo Foley's conclusory premise that the transferred funds were not "profits" of the wire fraud, we find no merger problem and thus no basis for limiting "proceeds" to profits in the first place.

Foley likens this case to Van Alstyne, a mail fraud case in which the Ninth Circuit held that distribution payments made to investors in the defendant's Ponzi scheme were operational expenses, thereby implicating the merger problem contemplated in Santos. See 584 F.3d at 815 ("[I]ssuing distribution checks . . . directly inspired investors to send more money to [the defendant's] funds, which could then be used to pay returns to other investors. The very nature of the scheme thus required some payments to investors for it to be at all successful."). But the Ninth Circuit also "recognize[d] that not all mail fraud schemes will involve payments that could implicate the 'merger' problem," and stressed that the merger analysis "must focus on the concrete details of the particular 'scheme to defraud,' rather than on whether mail fraud generally requires payments of the kind implicated in Santos." Id. Applying that contextual approach to this case, we find no merger problem. Instead, we agree with the government that this case is akin to United States v. Kennedy, 707 F.3d 558 (5th Cir. 2013), in which the Fifth Circuit held that the defendants' transfer of fraudulently obtained mortgage loan funds to a co-conspirator's

-16-

shell corporations did not implicate <u>Santos</u>. The court explained that the crime of wire fraud was consummated upon the lenders' transmission of the mortgage loan funds. <u>Id.</u> at 566. Unlike the Ponzi distributions in <u>Van Alstyne</u>, the subsequent transfer of funds to the shell corporations did not represent "'mere payment' of an expense of carrying on the wire fraud crime." <u>Id.</u> at 567 (quoting <u>Santos</u>, 553 U.S. at 527 (Stevens, J., concurring)).

So, too, in this case. The crime of wire fraud was complete upon Foley's receipt of the mortgage loan funds, and the subsequent transfer of funds to Reed did not represent payment of an expense of carrying on the fraud.[8] We thus find no merger of crimes, and hence no reason to apply <u>Santos</u>'s narrower definition of "proceeds" as profits.

---

[8] We are not swayed by Foley's argument that "[t]he charged scheme was to quickly obtain fraudulent mortgage loans in order to pay Elizabeth Reed for the properties at 135 Neponset Avenue" and that under the language of the indictment "[i]t was part of the scheme to defraud that Foley and [Reed] caused mortgage loan proceeds . . . to be disbursed from Foley's bank account to [Reed]." Our focus is on the charged crimes and not on the overarching scheme. <u>See</u> <u>Kennedy</u>, 707 F.3d at 566 ("If the entire <u>scheme</u> had come to a halt upon [the defendants'] receipt of the funds, the defendants would still have been guilty of the crime of wire fraud--which illustrates that the subsequent disbursements to the shell corporations have no bearing on the completion of the crime of wire fraud." (emphasis added)). The 33 wire fraud counts in Foley's indictment charged Foley with fraudulently causing the transmission of mortgage loan funds to his IOLTA account. The exact use to which Foley subsequently put these ill-gotten gains is beside the point.

-17-

## B. Evidentiary Issues

Foley next sets his sights on three of the district court's adverse evidentiary rulings. Foley preserved all three challenges; our review is accordingly for abuse of discretion. United States v. Muñoz-Franco, 487 F.3d 25, 62 (1st Cir. 2007).

### 1. Robbins's Testimony

Sean Robbins testified on direct examination that he had pleaded guilty to 24 counts of misprision of a felony. When asked to define "misprision," Robbins responded:

> Misprision means that I had knowledge of crimes committed by Mr. Foley at the Law Office of Marc Foley; namely, mortgage fraud. It means I didn't report those crimes to the authorities, and it also means that I concealed those crimes by having disbursement authorizations signed by Lisa Reed, which were essentially an agreement to conceal the nature of the transaction from the lenders.

Defense counsel immediately objected and moved to strike this testimony. The district court denied this motion.

Foley contends that the district court abused its discretion in failing to strike this testimony as unfairly prejudicial under Fed. R. Evid. 403.[9] More specifically, Foley argues that "[i]t was not for Sean Robbins to inform [the jury] that Mr. Foley was guilty of mortgage fraud based on the facts as

---

[9] Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

he knew them," and that Robbins's testimony was "particularly problematic" because Robbins, an attorney, "would be in a better position than the average person to know whether mortgage fraud had been committed."

We have made clear that "the fact of [a witness's] guilty plea and the plea agreement properly may be elicited to dampen the effect of an anticipated attack on the witness's credibility." United States v. Dworken, 855 F.2d 12, 30 (1st Cir. 1988); see also United States v. Richardson, 421 F.3d 17, 40-41 (1st Cir. 2005). We have accordingly upheld the admission of evidence concerning a co-conspirator's guilty plea, even though it similarly invites an inference of the defendant's guilt, when such evidence is accompanied by appropriate limiting instructions. See Dworken, 855 F.2d at 29-30; see also United States v. Gaev, 24 F.3d 473, 479 (3d Cir. 1994) ("Conspiracy by definition requires the participation of more than one party, and the jury may take a guilty plea by a co-conspirator as evidence of the defendant's guilt, an impermissible inference. Yet the testimony of a co-conspirator often cannot be properly evaluated without knowledge of the plea agreement.").

Here, as in Richardson, Dworken, and Gaev, the district court provided an appropriate limiting instruction in its final charge to the jury:

> Both [Reed and Robbins] testified that they
> have previously pled guilty to committing
> crimes related to the criminal activity
> charged in the indictment. The fact that

-19-

> these witnesses entered a guilty plea is not a factor that you may consider in assessing the guilt or innocence of Mr. Foley. Each of these witnesses may be presumed to have acted after an assessment of his or her own best interests, for reasons that are personal to the witness, but that fact has no bearing on guilt in this case. The guilty plea may only be considered by you in assessing the credibility of these witnesses' testimony.

Foley avers that this instruction was inadequate because it did not specifically "inform the jury that they were to disregard Mr. Robbins's personal and professional belief, as an attorney, that Marc Foley had committed mortgage fraud." But Foley never requested such an alternative instruction, and in any event we think that the challenged testimony fell within the instruction's general prohibition on considering Robbins's guilty plea as evidence of Foley's guilt. Robbins did not testify outright that he knew or believed that Foley committed mortgage fraud; rather, he testified to pleading guilty to misprision of a felony, which, in his words, "meant that [he] had knowledge of crimes committed by Mr. Foley at the Law Office of Marc Foley; namely, mortgage fraud." As we have suggested supra, this testimony is akin to the testimony of a co-conspirator concerning the fact of his guilty plea, which raises similar concerns as to the jury's assessment of the defendant's guilt. See Gaev, 24 F.3d at 479. Given the limiting instruction, we find no abuse of discretion in the admission of Robbins's testimony regarding his guilty plea.

-20-

## 2. Cross-Examination on Maximum Penalty

After Robbins testified about his guilty plea on direct examination, Foley twice sought to elicit information on cross-examination concerning the maximum statutory penalty that Robbins faced for misprision of a felony. After the district court sustained the government's objection to this questioning, Foley moved for a jury instruction on the relative penalties for misprision of a felony and wire fraud, which the court denied.

Foley contends that this evidence was "absolutely vital" to the jury's assessment of Robbins's credibility, because the jury was unaware that by pleading guilty to misprision of a felony and avoiding wire fraud charges, Robbins had "dramatically reduced" his "statutory exposure . . . on each count by 85 percent." But Foley himself concedes that the jury was aware that Robbins "was expecting to receive leniency in exchange for his testimony." More detail concerning the respective statutory maxima of the two crimes was neither necessary nor even particularly relevant given that the statutory maximum is rarely probative of the penalty a defendant will receive. See United States v. Mulinelli-Navas, 111 F.3d 983, 987-88 (1st Cir. 1997) (finding no abuse of discretion where the district court limited cross-examination concerning witnesses' maximum potential sentences; "[t]he jury could infer from the circumstances that the accomplices had avoided being charged with offenses carrying greater sentences by testifying in the

government's case," and information concerning potential sentences could have confused the jury by presenting it with the potential punishment faced by the defendant herself); see also United States v. Larson, 495 F.3d 1094, 1106 (9th Cir. 2007) (en banc) ("The potential maximum statutory sentence . . . lacks significant probative force because a defendant seldom receives the maximum penalty permissible under the statute of conviction.").[10]  We therefore find no abuse of discretion.

### 3.    Foreclosure Evidence

Foley also takes issue with the admission of evidence concerning foreclosures of properties on which the lending companies lost money, which he contends "was irrelevant and highly inflammatory because foreclosures have reduced property values throughout the country and are blamed for the recent economic recession."

Although Foley is correct that loss is not an element of wire fraud, we have recognized loss as probative of "a defendant's knowledge or intent to commit fraud." Muñoz-Franco, 487 F.3d at 62.   "Thus, while an ultimate purpose of either causing some

---

[10]    Larson itself held that the district court abused its discretion in "prevent[ing] defense counsel from exploring the mandatory life sentence that [a witness] faced in the absence of a motion by the Government."  495 F.3d at 1107.  The Ninth Circuit explained, however, that unlike a statutory maximum sentence, "the witness knows with certainty that he will receive [a mandatory minimum sentence] unless he satisfies the government with substantial and meaningful cooperation so that it will move to reduce his sentence."  Id. at 1106.

financial loss to another or bringing about some financial gain to oneself is not the essence of fraudulent intent, the knowledge that one's actions are, in fact, bringing about such losses may demonstrate one's intent to commit fraud." Id. (internal quotation marks omitted) (citation omitted); see also, e.g., United States v. Foshee, 606 F.2d 111, 113 (5th Cir. 1979) ("Fraudulent intent is supported by proof that [s]omeone was actually victimized by the fraud." (internal quotation marks omitted) (citation omitted)).

At Foley's trial, former employees of the lending companies testified that but for the misrepresentations that buyers had brought money to the loan closings, the lenders would not have funded the mortgage loans. The jury could therefore infer that the lenders' losses were a direct consequence of Foley's mendacity and that Foley's misrepresentations were intentional. Moreover, any prejudice resulting from this evidence was relatively nugatory, as the testimony focused on the financial consequences to the lending companies rather than on the more palpable consequences for homeowners. The district court therefore did not abuse its discretion in declining to exclude this evidence as irrelevant or unfairly prejudicial.

### C.    Prosecutorial Misconduct

Foley alleges two instances of prosecutorial misconduct during closing argument. As Foley objected to both remarks below,

our review is de novo.  United States v. Ayala-García, 574 F.3d 5, 16 (1st Cir. 2009).

### 1.  Characterization of Robbins's Testimony

Foley first claims that the prosecutor misstated the testimony of Sean Robbins in his closing argument.  Although "[t]he law is clear that a prosecutor's reliance (or apparent reliance) upon matters not in evidence is improper," United States v. Auch, 187 F.3d 125, 129 (1st Cir. 1999), we find no inaccuracy in the challenged remarks and thus no misconduct.

On direct examination, Robbins testified that he had "expressed concern" to Foley in March 2007 "over how the transactions were handled" and that he had asked Foley "why they were disbursing without buyer's funds."  When asked how Foley had responded, Robbins answered: "He said they used the disbursement authorizations -- well, he said he had found out that after -- in the second week of the Neponset closings, that buyers weren't -- hadn't been bringing checks and that he yelled at Nancy [his paralegal] about it."  Again on redirect examination, Robbins was asked what Foley had told him in that conversation "about whether or not he knew checks were coming."  Robbins replied: "He said he had found out that no checks had come, and -- about the second week, and he yelled at Nancy Molinari for disbursing, despite the fact there were no checks."

Ostensibly based on this testimony, the prosecutor stated the following in his closing argument:

> [R]emember that conversation when the defendant and Sean Robbins in March were going to get coffee? Remember what Sean Robbins told you? He was still bothered by the whole thing. He knew it was wrong, and he was bothered by it, and that's the conversation in which defendant Foley said, I knew by the second week there were no checks.
> Now, I submit to you that the evidence in this case and what you know from the evidence is from day one Mr. Foley knew there were not going to be any checks. But at a minimum, he has admitted to Sean Robbins that he knew there were no checks from at least the second week.

In his own closing argument, defense counsel responded:

> Mr. Wild [the prosecutor] tells you during his closing argument that Sean Robbins testified that Mr. Foley told him in March that he had known in December that no checks were forthcoming. . . . I respectfully submit to you . . . Mr. Robbins never testified that Mr. Foley had told him in December that he knew no checks were forthcoming. . . . Neither Mr. Robbins nor Ms. Molinari ever testified that Mr. Foley ever indicated between December 19th and January 12th that no checks would be brought to the law office at the conclusion of the closings.

The prosecutor then stated in rebuttal:

> You were told that Mr. Robbins didn't testify about that conversation on the way to get coffee in March and what Mr. Foley said to him. If you took notes, I would suggest you look near the end of Mr. Robbins' testimony. I believe it's on Ms. Lei's redirect questioning of him. Look for what was said there.

-25-

Following the government's rebuttal, Foley objected that the prosecutor had "misstated the evidence and added evidence to the case" by stating that "Mr. Robbins testified that Mr. Foley knew in December of 2006 that no funds would be forthcoming." The district court expressed its concern at that time "about the reference to when Mr. Robbins supposedly got an admission from Mr. Foley as to whether he knew and when he knew that the funds were not forthcoming." Accordingly, the court instructed the jury that the lawyers' statements were not evidence and that the jury's memory of the evidence controlled, using this particular dispute as an illustration.

After the verdict, Foley moved for a new trial on the basis of the government's alleged misrepresentation, which he claimed was fatal to his defense that he believed in good faith that checks were forthcoming. Finding no inaccuracies in the government's closing and rebuttal, the district court denied the motion. The court found the prosecutor's statement that "Foley said, I knew by the second week that there were no checks" wholly consistent with Robbins's underlying testimony that Foley "said he had found out that no checks had come" by the second week. Although the prosecutor proceeded to state that "the evidence in this case and what you know from the evidence is from day one Mr. Foley knew there were not going to be any checks," the court emphasized that that remark did not purport to rest solely on

Robbins's testimony but rather on <u>all</u> of the evidence in the case, including Reed's testimony that Foley had prepared the disbursement authorization forms in December 2006 to "paper the file." The court concluded that Foley's claim of misconduct was "especially puzzling in light of the fact that it was defense counsel who misstated the government's arguments to the jury, erroneously asserting that government counsel had said that Robbins had testified that Foley admitted that he knew in December no checks were forthcoming."

We agree with the district court's cogent analysis. Contrary to Foley's assertions, the government did not indicate that "Mr. Foley told Mr. Robbins that he knew by the second week that no checks were <u>forthcoming</u>," only that Foley knew by the second week that "there <u>were</u> no checks," in keeping with Robbins's testimony that Foley had "found out that no checks had come." In proceeding to suggest that Foley knew "from day one" that no checks were forthcoming, the prosecutor relied on different evidence, as his next remark implied: "But at a minimum, [Foley] has admitted to Sean Robbins that he knew there were no checks from at least the second week." The government's argument was thus that even if the jury did not infer from the other "evidence in this case" that Foley knew all along that no checks were forthcoming, Robbins's testimony indicated that Foley at least knew by the second week

-27-

that no checks had come.  That is in no way a mischaracterization of Robbins's testimony.[11]

### 2.    Instruction to Hold Foley Accountable

Foley also avers that the prosecutor engaged in misconduct by instructing the jury to hold Foley accountable.  In his closing argument, Foley's lawyer asserted both a good faith defense premised on Reed's deceitfulness and a materiality defense premised on the lenders' willingness to advance loans despite their "total disregard for the truthfulness of the information in the applications."  Defense counsel posed the following rhetorical question to the jury:

> Will you permit subprime lenders . . . and the executives who ran those firms into the ground while making millions of dollars to continue to portray themselves as victims of mortgage fraud, or will you declare that [the prosecutor] and his team have fallen for a great misdirection campaign, joining forces with subprime members . . . to go after closing lawyers, glorified paper pushers like Mr. Foley?

Among other things, defense counsel also alluded to the fraud convictions of various lending company executives.

---

[11]  Foley attempts to bolster his argument by pointing to the district court's statement that it was "a little concerned about the reference to when Mr. Robbins supposedly got an admission from Mr. Foley as to whether he knew and when he knew that the funds were not forthcoming."  But that remark was made immediately after Foley's objection to the alleged misstatement and thus before the court had reviewed the transcripts of Robbins's testimony and of the prosecutor's closing argument.  After conducting such a review, the district court found no mischaracterization, as it explained in denying Foley's motion for a new trial.

-28-

In rebuttal, the prosecutor responded:

> Ultimately, what you heard in a fairly lengthy talk with you was that everybody should be held responsible except Mr. Foley. All of those lenders ought to be held responsible, but not Mr. Foley. All of those loan processors ought to be held responsible, but not Mr. Foley. Lisa Reed ought to be held responsible, and she is, but not Mr. Foley. Sean Robbins ought to be held responsible, and he is. But not Mr. Foley.
> The argument is that there was a very large scale across the industry in the go-go days, a lot of fraud, and people ought to be held responsible for that. Like the executives ought to be held responsible, and counsel made a big point of how they were held responsible. They were prosecuted. Then he tells you you have to stop letting those people be victims.
> Well, which is it, Mr. Goldstein [defense counsel]? They're responsible, and they got prosecuted, or they're victims? You can't argue it both ways. The fact is they are among the people who have been prosecuted out of the mortgage fraud in this country. And now it's time for Mr. Foley to be held accountable by you on the charges in the indictment based on all he knew and what he did.

Following rebuttal, Foley objected to the remark that it was "time for Mr. Foley to be held accountable by you." The government responded that this commentary was permissible as "a direct response to what [defense] counsel had gone on at length about who else was responsible and ought to be held responsible," and the district court agreed.

We, too, find no impropriety in these remarks. As the government recognized below, we have "typically cede[d] prosecutors

some latitude in responding to defense counsel," distinguishing between "[t]he Government's response to statements made by defendant's counsel" and "statements made by the Government without provocation."  United States v. Skerret-Ortega, 529 F.3d 33, 40 (1st Cir. 2008) (internal quotation marks omitted) (citation omitted).  Given Foley's strategy of shifting blame to Reed and to the lenders, the government's rebuttal was within the latitude we recognized in Skerret-Ortega.[12]

### III.

We now turn to the array of arguments Foley raises as to the reasonableness of his sentence and the calculation of restitution.

**A.    Sentence**

**1.    Procedural Reasonableness**

Foley first challenges the procedural reasonableness of his sentence, contending that the district court miscalculated the

---

[12]  United States v. Landrón-Class, 696 F.3d 62, 71 (1st Cir. 2012), on which Foley relies, is not to the contrary.  In Landrón-Class, the government invited a guilt-by-association inference in its closing argument, stating that a witness's non-testifying co-defendants had "already been dealt with" via their guilty pleas.  Id. (internal quotation marks omitted).  Consequently, the prosecution's argument "was likely to appear as an attempt to suggest to the jury that, just as those individuals were held responsible, now it is appellant's turn."  Id.  Here, by contrast, it was Foley who initially attempted to shift blame to Reed and to the lending industry, and the government's rebuttal merely responded to that argument.  We therefore do not interpret the challenged commentary as drawing the type of guilt-by-association inference that troubled us in Landrón-Class.

loss caused by Foley and improperly imposed the two-level "sophisticated means" enhancement, U.S.S.G. §2B1.1(b)(10)(c). We address each issue in turn.[13]

### i. Loss Calculation

U.S.S.G. §2B1.1(b)(1) increases a defendant's base offense level for fraud according to the degree of resultant pecuniary loss. Loss is generally equal to "the greater of actual loss or intended loss," id. cmt. n.3(A); "actual loss" is in turn defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," id. cmt. n.3(A)(i). "Reasonably foreseeable pecuniary harm" refers to "pecuniary harm that the defendant knew, or, under the circumstances, reasonably should have known, was a potential result of the offense." Id. cmt. n(3)(A)(iv); see also United States v. Farano, 749 F.3d 658, 665 (7th Cir. 2014) (stressing that "[t]he key word [in this definition] is 'potential,' which means 'could happen'").

---

[13] We have recognized that when a sentence "falls below the bottom of the Guidelines range, a defendant may still challenge the incorrect Guidelines calculation." United States v. Ramírez, 708 F.3d 295, 308 (1st Cir. 2013); see also United States v. Paneto, 661 F.3d 709, 715 (1st Cir. 2011). Although the government correctly notes that the district court "substantially discounted the import of the loss amount at sentencing," ultimately imposing a variant 72-month sentence (well below the calculated Guidelines range of 108 to 135 months), we think it at least possible that the court might have imposed an even lower variant sentence had it begun with a lower Guidelines range. We therefore decline the government's invitation to find any Guidelines error harmless as we did in United States v. Tavares, 705 F.3d 4, 24-28 (1st Cir. 2013), and United States v. Marsh, 561 F.3 81, 86 (1st Cir. 2009).

Deeming Foley responsible for an actual loss of $3,239,204, the district court applied an 18-level enhancement under §2B1.1(b)(1)(J), corresponding to a loss between $2.5 million and $7 million. Foley avers that "the actual loss amount is over $1 million but under $2.5 million," such that his base offense level should only have been increased by 16 points under §2B1.1(b)(1)(I). His primary contention is that he "could not have reasonably expected the loss that actually occurred" as a result of his crimes. Foley raised this objection below; we accordingly review de novo the district court's calculation methodology and review for clear error its mathematical application of this methodology. Appolon, 695 F.3d at 66.

In Appolon, another mortgage fraud case, we stated that "actual loss is always the difference between the original loan amount and the final foreclosure price (less any principal repayments)." Id. at 67. Accordingly, we explained that "actual loss usually can be calculated by subtracting the value of the collateral--or, if the lender has foreclosed on and sold the collateral, the amount of the sales price--from the amount of the outstanding balance on the loan." Id. (internal quotation marks omitted) (citation omitted); see also U.S.S.G. §2B1.2 cmt. n.3(E)(ii)-(iii). Here, the district court employed that methodology, subtracting from the original loan amount for each

condominium either the foreclosure sale price or, if no resale had occurred, the 2012 assessment value.

Foley attempts to distinguish <u>Appolon</u>, pointing out that the defendants in that case personally prepared fraudulent loan applications on behalf of straw buyers and created separate HUD-1 forms for each property, one with the actual sales price and one with the inflated price from the fraudulent loan application. Moreover, the <u>Appolon</u> defendants were themselves directly responsible for permitting the mortgage loans to default. On those facts, we rejected the <u>Appolon</u> defendants' argument that the "substantial disparity between the original loan amounts and the properties' final values" was unforeseeable. 695 F.3d at 68-69. We stressed that as "veterans of the real estate industry," the defendants "knew that the mortgage loans on the properties involved in their scheme would enter default and that most, if not all, of the properties would be forced into foreclosure"; that they "could reasonably have anticipated that the properties would be grossly devalued as a result"; and that "[e]ven if the deterioration of the Boston real estate market during the recent recession also played some macroeconomic role in that outcome, [the defendants] could reasonably have expected that they were contributing to the emergence of those poor market conditions." <u>Id.</u> at 69.

By contrast, Foley asserts that unlike the scheme in <u>Appolon</u>, "[t]he goal of this enterprise was for it to succeed." He

points out, <u>inter</u> <u>alia</u>, that the condominiums were priced according to independent appraisals rather than artificially inflated as in <u>Appolon</u>, and that some of the buyers testified that they made mortgage payments on the properties. Moreover, Foley himself was not involved in the submission of fraudulent loan applications and the payment of kickbacks to buyers; his only role was to orchestrate the fraudulent loan closings.

This may be a closer case than <u>Appolon</u>, but we ultimately find Foley's distinctions unpersuasive. Like the defendants in that case, Foley was a savvy "veteran[] of the real estate industry." <u>Id.</u> He may not have known that the borrowers' loan applications were falsified, but he knew that the borrowers had not brought funds to the loan closings and, even more importantly, concealed this fact in the submitted HUD-1 forms. As the evidence at trial established, the lenders would not have extended loans but for this misrepresentation because, as one lending company employee testified, a borrower's down payment "lessens the risk of the lender." The very act of misrepresentation thus implies Foley's awareness that the lenders would not have advanced the funds to borrowers with no skin in the proverbial game. Given Foley's professional experience, it strains credulity for him to suggest that he was unaware of the reason why. Foley knew or should have known that these non-paying borrowers presented a greater risk of

default; therefore, foreclosure was an eminently foreseeable consequence of his fraud.[14]

Foley next alleges a handful of more specific errors in the district court's loss calculation, none of which he challenged below. We accordingly review for plain error only. United States v. Albanese, 287 F.3d 226, 228 (1st Cir. 2002).

Foley claims that the district court relied on inaccurate sale prices for several of the condominiums, such that the actual loss figure should have been reduced by $17,200; that one of the

---

[14] To the extent that Foley implies that the quantum of loss was unforeseeable due to a decline in real estate values, we rejected a comparable argument in Appolon: "Even if the deterioration of the Boston real estate market during the recent recession also played some macroeconomic role in [the properties' devaluation], [the defendants] could reasonably have expected that they were contributing to the emergence of those poor market conditions." 695 F.3d at 69; see also Farano, 749 F.3d at 665 (rejecting defendants' argument that lenders' loss was unforeseeable because defendants "could not know what the properties would bring at a foreclosure sale, given uncertainty about future real estate prices").

We note in passing that two other circuits, interpreting the language of U.S.S.G. §2B1.2 cmt. n.3(E), do not even apply a foreseeability analysis to the calculation of "credits against loss" represented by the proceeds of a foreclosure sale. See United States v. Crowe, 735 F.3d 1229, 1237 (10th Cir. 2013) ("[I]t is irrelevant in this case whether or not [the defendant], at the time she negotiated the various mortgages at issue, reasonably anticipated a precipitous decline in the real estate market that might result in the original lender or successor lenders being unable to recoup their losses from the sale of pledged collateral should she default."); see also United States v. Turk, 626 F.3d 743, 749 (2d Cir. 2010) ("[T]he victims' loss was the unpaid principal, and we hold that the decline in value in any purported collateral need not have been foreseeable to [the defendant] in order for her to be held accountable for that entire loss."). As we find the properties' devaluation foreseeable in any event, we need not decide on this approach today.

condominium units was never foreclosed upon and should not be included in the loss calculation, further reducing actual loss by $67,600; that a loss of $118,104 arising from Foley's participation in a previous mortgage fraud scheme was not "relevant conduct" properly considered at sentencing; and that the district court failed to account for some of the borrowers' loan principal repayments, the extent of which Foley does not specify.

As mentioned above, the district court found Foley responsible for a total loss of $3,239,204, corresponding to U.S.S.G. §2B1.1(b)(1)(J)'s 18-level enhancement for losses between $2.5 million and $7 million. Even after the three reductions that Foley requests, which total $202,904, the loss figure would remain $3,036,300, well within the §2B1.1(b)(1)(J) range. Foley offers no figure for the borrowers' principal repayments; his suggestion that these repayments exceed $536,000, thereby bringing him into a lower Guidelines range, amounts to no more than mere speculation, which we need not credit on appeal. See Zannino, 895 F.2d at 17. Accordingly, Foley can show no prejudice, and hence no plain error, arising from the district court's alleged miscalculations. Cf. Albanese, 287 F.3d at 229 (finding no prejudice because, even crediting defendant's assignments of error, a reduction in criminal history score from six to four points would not change the defendant's criminal history category and Guidelines range).

### ii.  Sophisticated Means Enhancement

Foley also raises a preserved challenge to the district court's imposition of a two-level U.S.S.G. §2B1.1(b)(10)(C) enhancement for an offense involving "sophisticated means."  We review the district court's reading of §2B1.1(b)(10)(C) de novo and its factual findings for clear error.  United States v. Evano, 553 F.3d 109, 111 (1st Cir. 2009).  As defined in the Guidelines,

> "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. §2B1.1 cmt. n.9(B).  The enumerated examples are by no means exhaustive, and as other circuits have recognized, "the enhancement properly applies to conduct less sophisticated" than the examples.  United States v. Jennings, 711 F.3d 1144, 1147 (9th Cir. 2013) (collecting cases).  Moreover, a "scheme may be sophisticated even if the individual elements taken alone are not." Evano, 553 F.3d at 113.

In addition to submitting fraudulent HUD-1s, Foley took the fictitious down payments out of Reed's sale proceeds and directed Reed to sign disbursement authorization forms in those

amounts. And when some of the lenders sought additional proof of a borrower's down payment, Foley arranged for Reed to prepare fake checks purporting to show a down payment from the borrower, and directed his paralegal to draw and then redeposit a check in his IOLTA account to create the appearance that the borrower's funds had been received. Although Foley argues that none of these actions are "particularly sophisticated," the whole of the scheme is greater than the sum of its parts. "All this was enough to make [Foley's] scheme more effective and difficult to thwart, and it is enough to justify the enhancement." Id.[15]

## 2. Substantive Reasonableness

Foley next contends that his sentence was substantively unreasonable relative to the sentences of his co-defendants and of attorneys involved in mortgage fraud schemes in Appolon and United States v. Innarelli, 524 F.3d 286 (1st Cir. 2008). We review the district court's sentencing decision for abuse of discretion. United States v. Floyd, 740 F.3d 22, 39 (1st Cir. 2014).

Foley points out that in contrast to his 72-month sentence, "Lisa Reed, the mastermind of the scheme and the person who profited from it, received a sentence of 18 months," while Sean

---

[15] We also reject Foley's argument that the sophisticated means enhancement was unwarranted because a different district judge later declined to apply the same enhancement to Robbins at his sentencing. Robbins and Foley played different roles in the scheme, and in any event, there is no reason to conclude that one judge rather than the other was correct.

Robbins was not incarcerated at all. Foley further avers that he was less culpable than the lawyer defendants in Appolon and Innarelli, both of whom also received 72-month sentences. While Foley's involvement was limited to the submission of false HUD-1s over the course of several weeks, the defendant in Innarelli also prepared false title documents and did so as part of a conspiracy spanning three years. Similarly, the lawyer in Appolon falsified loan applications and purchase-and-sale agreements as well as HUD-1s.

Foley's proffered comparisons carry little weight. First, three of these other defendants -- Robbins, Reed, and the Innarelli defendant -- opted to plead guilty and are therefore dissimilarly situated to Foley. See Floyd, 740 F.3d at 39. Robbins and Reed also played different roles in the conspiracy: Robbins worked largely at Foley's direction, while Reed, even if the "mastermind of the scheme," was not a lawyer and therefore did not sully "the integrity and public trust in the bar," a factor which the district court stressed in sentencing Foley.

Although the lawyer defendant in Appolon did go to trial, we do not think that his additional misrepresentations made him so much more culpable as to render Foley's equivalent sentence an abuse of discretion. More broadly, we reject Foley's premise that because we upheld a different judge's sentence for a more culpable defendant in an unrelated case, the same sentence is therefore an

abuse of discretion in this case.  (Indeed, none of Foley's proposed congeners were sentenced by the same judge as Foley.)  As we stated in United States v. Saez, 444 F.3d 15, 19 (1st Cir. 2006), when "different judges sentenc[e] two defendants quite differently, there is no more reason to think that the first one was right than the second."  Moreover, we recognized that such comparisons raise significant "practical objections":

> A single judge sentencing two defendants for the same offense has the information before him and knows his own reasoning.  By contrast, to make a valid comparison between defendants sentenced by different judges is far more difficult, as this case illustrates.  Further, such a comparison opens the door to endless rummaging by lawyers through sentences in other cases, each side finding random examples to support a higher or lower sentence, as their clients' interests dictate.

Id.  We therefore decline to hold Foley's sentence to such a strict standard.

Aside from these faulty comparisons, we finally note that Foley's 72-month sentence is well below the Guidelines range of 108 to 135 months calculated by the district court.  "It is a rare below-the-range sentence that will prove vulnerable to a defendant's claim of substantive unreasonableness," and this case does not buck the trend.  United States v. King, 741 F.3d 305, 310 (1st Cir. 2014); see also Floyd, 740 F.3d at 39-40.  Foley's sentence was well within the district court's discretion.

**B.    Restitution**

Foley finally assigns error to the district court's restitution award of $2,198,204 under 18 U.S.C. § 3663A.  We review for abuse of discretion.  <u>United States</u> v. <u>Cornier-Ortiz</u>, 361 F.3d 29, 41 (1st Cir. 2004).

The district court awarded $2,080,100 in restitution to Taylor, Bean & Whitaker in connection with the Neponset Building fraud and $118,104 to Argent Mortgage arising from Foley's role in an earlier mortgage fraud.[16]  The district court arrived at that figure by subtracting from each mortgage loan the amount recouped via foreclosure sales or, for properties that had not been resold, the 2012 property assessment values.  Foley alleges several distinct errors in the district court's calculation and in its determination of the proper restitution recipients.  The government agrees that the restitution order should be vacated and remanded in part.  We address each issue in turn.

### 1.    Restitution for Unit 5

In calculating the total loss suffered by Taylor, Bean & Whitaker, the district court included a $67,600 loss associated with Unit 5 in the Neponset Building, which had not been foreclosed

---

[16]  Although the total losses in connection with the Neponset Building amounted to $3,121,100, the government only sought restitution for $2,080,100 to Taylor, Bean & Whitaker; the other loans had been sold on the secondary market, and the government found it "not feasible to determine specific amounts for restitution among the secondary market lenders/investors because a number of them are no longer operating."

upon and remained in the hands of the original buyer.  The government concedes that remand is warranted.  We therefore remand for further consideration as to the proper amount of restitution, if any, for this unit.

### 2.    Repayments by Borrowers

Foley and the government also agree that the district court erred in failing to offset the original loan amounts by principal repayments made by some of the borrowers.  We accordingly remand for the district court to recalculate the lenders' loss on this basis.

### 3.    Identity of Victim

Foley and the government further agree that remand is proper to determine whether Taylor, Bean & Whitaker is the proper recipient of restitution as to Units 2 and 32 of the Neponset Building, which were foreclosed upon and bought by other entities. We remand so that the district court may determine whether Taylor, Bean & Whitaker or another entity is entitled to restitution with respect to these units.

### 4.    Calculation of Offset Value

Foley also assigns error to the district court's method of offsetting the original loan amount by the amount recouped at the foreclosure sale, or for units that had not been resold, the 2012 tax assessment value.  Foley contends that "the loss to the lenders was set when the foreclosure was complete," such that the

loan amount should have been offset by the property's fair market value at the time that the lender took possession.

Under 18 U.S.C. § 3663A(a)(1), "when sentencing a defendant convicted of [fraud and other specified offenses], the court shall order . . . that the defendant make restitution to the victim of the offense." For offenses such as fraud that "result[] in . . . loss . . . of property of a victim of the offense," the restitution order shall require the return of the lost property, or, if return of the property is "impossible, impracticable, or inadequate," payment of an amount equal to the value of the property less "the value . . . of any part of the property that is returned." Id. § 3663A(b)(1).

At the time that Foley filed this appeal, the circuits were divided on the proper calculation of the offsetting "value . . . of any part of the property that is returned" in mortgage fraud cases. Compare United States v. Robers, 698 F.3d 937, 942 (7th Cir. 2012) (offsetting the amount of money received at foreclosure sale), with United States v. Yeung, 672 F.3d 594, 604 (9th Cir. 2012) (offsetting the value of the property on the date the lender acquired title). The Supreme Court has since resolved the question, holding that the restitution award must be offset "by the amount of money the victim received in selling the collateral, not the value of the collateral when the victim received it." Robers v. United States, 134 S. Ct. 1854, 1856 (2014). The

Robers Court reached this conclusion by interpreting the statutory phrase "any part of the property" as "refer[ring] only to the specific property lost by a victim, which, in the case of a fraudulently obtained loan, is the money lent." Id. Consequently, the Court explained that "no 'part of the property' is 'returned' to the victim until the collateral is sold and the victim receives money from the sale." Id.

Robers did not squarely resolve the proper calculation of loss when the collateral remained unsold at the time of sentencing, suggesting in dicta that "[o]ther provisions of the [restitution] statute allow the court to avoid an undercompensation or a windfall." Id. at 1858. Among other things, the Court noted that those provisions "would seem to give a court adequate authority to count, as part of the restitution paid, the value of collateral previously received but not sold." Id. Two concurring Justices further suggested that "[i]f a victim chooses to hold collateral rather than reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." Id. at 1860 (Sotomayor, J., concurring, joined by Ginsburg, J.). Seizing on these qualifications, Foley suggests in a post-Robers Fed. R. App. P. 28(j) letter that a rehearing should be ordered as to the applicability of Robers in this case.

To be sure, Robers did not address the district court's method of offsetting the loan amount by the 2012 tax assessment value for properties that had not yet been sold. But this approach, if anything, inured to Foley's benefit, granting an offset even though under Robers the lenders' "property" (i.e., money lent) had yet to be returned. Nor does this case raise the specter of unreasonable delay contemplated by the concurring Justices. Like the defendant in Robers, Foley made no argument that the lenders delayed selling the properties because of a "choice to hold the homes as investments." Id. As the concurring Justices recognized, "[r]eal property is not a liquid asset, which means that converting it to cash often takes time. . . . Because such delays are foreseeable, it is fair for [the defendant] to bear their cost: the diminution in the homes' value." Id. That principle is equally germane here.[17]

_____

[17] Foley also suggests in his Rule 28(j) letter that rehearing is necessary to address the applicability of Robers's proximate cause analysis "to a defendant, who was not a straw buyer like Robers but an attorney who came onto the scene after the loan applications had been approved." We disagree. We have already rejected Foley's argument that the foreclosures were unforeseeable to him, see section III.A.1.i. supra, and to the extent Foley implies that he did not proximately cause the drop in property values, Robers rejected that very argument. See 134 S. Ct. at 1859 (explaining that "[f]luctuations in property values are common . . . [and] foreseeable" and that "losses in part incurred through a decline in the value of collateral sold are directly related to an offender's having obtained collateralized property through fraud").

In short, <u>Robers</u> vindicates rather than impugns the district court's methodology. We therefore find no basis for the rehearing Foley requests.

### 5.   343 Centre Street

Foley finally argues that the district court erred in granting $118,104 in restitution to Argent Mortgage for the loss arising from Foley's fraudulent purchase in November 2005 of property at 343 Centre Street in Dorchester, Massachusetts -- a figure also included in the district court's Guidelines loss calculation.[18] As detailed in Foley's presentence report, after purchasing this building with Reed in the name of a friend, Foley then purchased a condominium unit in the building. Foley financed the condominium purchase with a mortgage loan from Argent, and signed a HUD-1 form falsely indicating that he had brought money to the loan closing. After Foley defaulted on the loan and the condominium unit was foreclosed upon, Argent lost $118,104.

Section 3663A(a)(2) defines a "victim" entitled to restitution as

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed

---

[18]   As discussed in section III.A.1.i <u>supra</u>, the inclusion of this figure in the Guidelines calculation was ultimately immaterial to Foley's base offense level under U.S.S.G. §2B1.1(b)(1).

> by the defendant's criminal conduct in the
> course of the scheme, conspiracy, or pattern.

Because wire fraud involves a "scheme or artifice to defraud," 18 U.S.C. § 1343, we have allowed restitution "without regard to whether the conduct that harmed the victim was conduct underlying the offense of conviction." United States v. Matos, 611 F.3d 31, 43 (1st Cir. 2010) (internal quotation marks omitted) (citation omitted). Instead, a restitution order "encompass[es] all direct harm from the criminal conduct of the defendant which was within any scheme, conspiracy, or pattern of activity that was an element of any offense of conviction." United States v. Hensley, 91 F.3d 274, 277 (1st Cir. 1996). Hence, "in determining whether particular criminal conduct comprised part of a unitary scheme to defraud, the sentencing court should consider the totality of the circumstances, including the nature of the scheme, the identity of its participants and victims, and any commonality in timing, goals, and modus operandi." Id. at 278. In Foley's estimation, the 343 Centre Street transaction did not fall within the wire fraud scheme for which he was convicted. We agree.

In determining the extent of the underlying scheme, we begin with the terms of the indictment. See id. at 277; see also, e.g., United States v. Turino, 978 F.2d 315, 319 (7th Cir. 1992). The indictment alleged that Foley engaged in a scheme to defraud mortgage lenders "[f]rom in or about December of 2006 to in or about January of 2007 . . . in connection with the financing of

residential real estate purchases of condominiums at 135 Neponset Avenue in Dorchester, Massachusetts." As part of the alleged scheme, "Foley agreed with [Reed] to act as the settlement agent, to prepare loan closing documents, and to conduct the closings of mortgage loans in the names of the straw buyers."

Even focusing on the "broad 'boilerplate' language . . . rather than the specific conduct alleged" in the indictment, Hensley, 91 F.3d at 277, we think the district court stretched the underlying scheme too far in extending it to the 343 Centre Street transaction. Although the participants were identical (Foley, Reed, and Robbins) and although the 343 Centre Street transaction also involved a falsified HUD-1 form representing that the buyer had brought funds to closing, Foley played a different role, acting as the fraudulent purchaser rather than as the settlement agent. More importantly, the 343 Centre Street transaction occurred over a year before the scheme for which Foley was convicted, which (according to the indictment) ran "from in or about December of 2006 to in or about January of 2007." That is in stark contrast to Hensley, which involved a unitary scheme spanning a mere two weeks. Id. at 278. Furthermore, the indictment expressly delimited the scheme to "the financing of residential real estate purchases of condominiums at 135 Neponset Avenue." We accordingly vacate the district court's award of $118,104 in restitution to Argent Mortgage.

**IV.**

For the foregoing reasons, we **affirm** Foley's conviction and incarcerative sentence. We **affirm in part** and **vacate in part** the district court's restitution order, and **remand** for further proceedings consistent with this opinion.