# United States Court of Appeals
## For the First Circuit

No. 17-1404

UNITED STATES OF AMERICA,

Appellee,

v.

ALEJANDRO MAYENDÍA-BLANCO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

Ignacio Fernández de Lahongrais for appellant.
Mainon A. Schwartz, Assistant United States Attorney, with
whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and
Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief,
Appellate Division, were on brief, for appellee.

September 25, 2018

**THOMPSON**, **Circuit Judge**.   What was true in nineteenth-century Russia is just as true in the twenty-first century First Circuit, "[h]appy families are all alike; every unhappy family is unhappy in its own way."[1]   In this instance, the love between parent and child spawned a three count indictment for making and conspiring to make false statements on a mortgage loan application in violation of 18 U.S.C. § 1014 and § 2.   Appellant Alejandro Mayendía-Blanco ("Mayendía") pleaded guilty to one count, but appeals his sentence of twenty-one months, claiming that the district court made several errors in the calculation of his sentencing guideline range.   We find no error suitable for vacating his sentence, and thus affirm.

## I. Background

### A. The Facts[2]

While Mayendía's family story had definitely gone awry by the time it reached our doorstep, it wasn't always that way. For many years he earned a legitimate living buying real estate properties, refurbishing them, and selling them for a profit, colloquially known as "flipping."[3] Over time, Mayendía flipped

---

[1] Leo Tolstoy, Anna Karenina (1877).
[2] We draw the facts in this opinion from the record before us on appeal, in particular the pre-sentence report, the indictment, the plea agreement, and the sentencing hearing transcript.   See United States v. Lee, 892 F.3d 488, 490 n.1 (1st Cir. 2018).
[3] This real estate investing approach is prominently displayed in numerous television shows on the HGTV channel.   See, e.g., HGTV,

fifteen to twenty properties in both Puerto Rico and Miami. But Mayendía's livelihood became his liability. Mayendía's work flipping properties landed him in hot water when in a series of loan applications, he claimed to have received down payments on the sale of three properties, when those down payments had actually been reimbursed to purchasing family members. Here are the details.

Count One of Mayendía's indictment pertains to a loan application made on May 24, 2007. Mayendía sold real property in Puerto Rico to Nell N. Blanco-Casasnovas, his mother, and to finance that purchase, she applied for a loan in the amount of $1,320,000 from First Equity Mortgage Bankers, Inc. ("FEMBI"). The mortgage on that loan was eventually assigned, sold, and transferred to the First Bank of Puerto Rico ("FBPR"), a federally insured financial institution that falls within the purview of 18 U.S.C. § 1014. Part of the mortgage application process involved the completion of a joint buyer/seller United States Department of Housing and Urban Development (HUD) Settlement Statement Form which itemizes all closing costs imposed on both parties in the real estate transaction and which gets submitted to the bank along with the mortgage loan application. On that form Mayendía and his mother listed that she had given him $314,267.27 as a down payment.

---

Flip or Flop, About the Show, www.hgtv.com/shows/flip-or-flop (last visited Sept. 21, 2018).

However, after the application was made, and without telling the bank, Mayendía gave the down payment money back to his mom.

In a similar bait and switch in Counts Two and Three, Mayendía sold two pieces of real estate to Orlando Mayendía-Díaz, his father. On October 3, 2008, Mayendía's father applied for one loan worth $140,000 and another loan worth $148,000, both also from FEMBI, and which also, down the road, were assigned, sold, and transferred to FBPR. Mayendía and his father stated on the HUD Settlement Statement Forms that Mayendía had received a down payment on the first sale of $46,481.60 and on the other, $48,381.10. However post application loan submissions, Mayendía returned the money to his dad.

Initially, despite the omission of this information from the HUD Settlement Statement Forms, all was well. At least with regard to the property in Count Two, Mayendía's dad made about fifty mortgage payments between 2008 and 2012, but when his business closed during the recession, he was unable to continue to make payments on the property and defaulted on the loan.[4] In 2015 Mayendía (along with his parents) was indicted on three counts of making and conspiring to make false statements on a mortgage loan application to a federally insured bank, in violation of 18 U.S.C.

---

[4] There is no indication in the record one way or the other about when Mayendía's parents defaulted on the mortgages from Counts One and Three, and no information about how any of the mortgage inaccuracies came to the attention of authorities.

§ 1014 and § 2. In 2016 Mayendía pled guilty to Count Two of the indictment and, as part of a plea agreement, Counts One and Three were dismissed.

## B. The Sentencing Hearing

With the procedural history put briefly in place, we proceed to Mayendía's sentencing because to paraphrase from Shakespeare, therein lies the rub.[5] After Counts One and Three were dismissed, the parties agreed that Mayendía's total offense level under the Guidelines should be thirteen, considering only the loan Mayendía's father received from Count Two as the "loss" amount, the dollar amount used to reasonably estimate the harm from monetary crimes such as false statements in mortgage loan applications, and often the linchpin of the guidelines range in cases like this one. See U.S.S.G. § 2B1.1.

Probation and Pretrial Services filed a pre-sentence report ("PSR"), followed by two amended PSRs, each of which, in contrast to the parties' calculations, recommended a total offense level of sixteen based on a loss of $409,129.97 because "[a]ccording to the Indictment the total amount of loss as to Counts One, Two and Three" equaled that amount.[6] From arithmetic we can infer that $409,129.97 is the sum of the three down payments

---

[5] See William Shakespeare, Hamlet act 3, sc. 2.
[6] What we refer to as the PSR here is the final operative version, the second amended PSR.

related to Counts One, Two, and Three from the indictment. The PSR's recommendations result in a guidelines range of 21-27 months to serve, in contrast to the recommendation from Mayendía's plea agreement which was 12-18 months incarceration. See U.S.S.G. Appx. G.

In his sentencing memoranda and written objections to the PSR, Mayendía made three claims of error to probation's loss recommendation. First, he argued that the PSR should not have recommended a loss figure higher than what Mayendía bargained for with the government in his plea agreement, which was a loss of no more than $140,000. Second, Mayendía objected to the PSR's use of the down payments from the two dismissed counts, because he argued they should not be bundled together with his offense of conviction, Count Two, as "relevant conduct." See U.S.S.G. § 1B1.3. Third, Mayendía argued that the substantive amounts of money related to Counts One and Three should not be considered because Mayendía had not pleaded guilty to them, and therefore, the amounts were not supported by any factual findings or evidence.

Mayendía repeated these arguments at his sentencing hearing in 2017,[7] but the district court rejected them all. In

---

[7] Relevant later in the background, one unrelated issue also cropped up at sentencing. The district court made reference to documentation from the banks pertaining to the loss calculation, and Mayendía's attorney claimed that he had not seen or received these documents, and it was unclear from the record whether the district court had ultimately relied on them.

doing so the court decided that the loss was more than $250,000 but less than $550,000; however, it did not explicate the basis for this decision. Ultimately, the district court sentenced Mayendía to twenty-one months in prison, the lower end of the guidelines range for a total offense level of 16.[8] Having received an incarcerative sentence at the low end of his guidelines range, but having expected a lower guidelines range akin to the plea agreement's recommendation, Mayendía appealed to us, seeking a do-over of his guidelines range calculation and sentence.

## C. Proceedings on Appeal

Mayendía submitted his opening brief on July 25, 2017, making five arguments in support of his request that we vacate his sentence and remand for resentencing, two of which are still pertinent on appeal. First, and for the first time in the case, he argued that the district court erred by failing to apply an application note to the guidelines mandating that loss calculations relating to mortgage fraud must subtract the fair market value of the collateral (the loaned property) on the date the defendant pled guilty from the loss amount, so long as the property has not been "disposed of." U.S.S.G. § 2B1.1, app.

---

[8] Though irrelevant to Mayendía's appeal, we note that the court also imposed a $50,000.00 fine, a $98,666.00 restitution order and five years of supervision upon release.

- 7 -

n.3(E)(iii).[9]   Second, he argued that the district court procedurally erred when it failed to state on the record the basis and methodology for its loss calculation determination.

On August 17, 2017 we remanded Mayendía's case to the district court so that it could "provide clarification as to both the exact loss amount found for purposes of USSG § 2B1.1(b)(1) and the methodology employed when arriving at that loss amount, including specification of whether the amount reflects actual or intended loss." United States v. Mayendía-Blanco, No. 17-1404, Dkt. 00117190652 (1st Cir. Aug. 17, 2017). The district court responded promptly -- it explained that the loss was $409,129.97, based on the actual loss incurred as a result of the down payments from all three counts in the indictment, as recommended by the PSR. United States v. Mayendía-Blanco, No. 15-cr-00381-FAB-1, Dkt. 218 (D.P.R. Aug. 31, 2017).[10]

---

[9] As a part of this point, Mayendía argued in his opening brief that even if the district court did not commit a separate error by using the down payment figures rather than the fair market values, the collateral still should have been subtracted from the down payment numbers.

[10] Because the district court's order clarifies that it based the loss amount on down payments, rather than loan amounts, Mayendía's third opening argument--that the district court erroneously relied on the documents that were being sent piecemeal from the bank to the probation officer, who Mayendía alleges was providing these documents to the district court ex parte, without providing appropriate copies or summaries of that information to him, see Fed. R. Crim. P. 32(i)(1)(B), and his fourth argument, made for the first time on appeal--that the district court erred by considering bank documents attached as exhibits to the PSR which

With the district court's reasoning in hand, on September 5, 2017, we issued an order directing Mayendía to file "a supplemental memorandum" in support of his pending motion for bail pending appeal, as well as a supplemental "merits brief." He complied with our directive and in both filings, Mayendía advanced two specific arguments.[11] First, he resurrected the relevant conduct argument, raised below at his sentencing hearing but omitted from his opening brief and initial pre-remand brief in support of his bail motion;[12] and second he hammered again the subtraction-of-collateral argument, which he had discussed in his opening brief. The government responded to Mayendía's supplemental briefing, and in turn, Mayendía filed a reply brief.

With that procedural stage set, we take on Mayendía's legal arguments.

## II. Discussion

Given the district court's clarification of its reasoning for the sentence imposed, what Mayendía presents to us, when distilled, boils down to two issues: (1) the district court's

---

included language that had not been translated from Spanish to English, are moot. A fifth argument citing judicial bias and requesting reassignment of his sentencing hearing to another judge is also moot given today's ruling.

[11] Mayendía's supplemental brief incorporates by reference the arguments he advanced in his memo in support of bail.

[12] Before filing his opening brief, on July 19, 2017, Mayendía had filed his first brief in support of his motion for bail pending appeal.

alleged error in considering the down payments from dismissed Counts One and Three as relevant conduct in his loss calculation at sentencing without a preponderance of the evidence; and (2) the district court's alleged error in failing to apply a guidelines application note mandating that district courts subtract the fair market value of unsold collateral from the actual loss.[13]  In taking up Mayendía's appellate arguments, we stage each substantive issue in turn.

### A. Considering Counts One and Three

Mayendía says the district court erred in considering Counts One and Three in its actual loss calculation because the conduct from these counts was not supported by a preponderance of the evidence.  The government responds that Mayendía waived or forfeited this argument, but even if he didn't that it fails on the merits.  We find that Mayendía waived his argument due to his failure to raise the preponderance of evidence argument in his opening brief.

We deem an argument to be waived when a party "intentionally relinquishes or abandons it."  United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002).  "[A] waived issue ordinarily cannot be resurrected on appeal."  Id.  Relevant here,

---

[13] The majority does not "recast" Mayendía's argument as the dissent suggests we have done.  Rather, we simply repeat his argument as we understand it to be.

it is a well-settled principle that arguments not raised by a party in its opening brief are waived.  Landrau-Romero v. Banco Popular De P.R., 212 F.3d 607, 616 (1st Cir. 2000) (citing P.R. Tel. Co. v. Telecomm. Regulatory Bd. Of P.R., 189 F.3d 1, 17 n.14 (1st Cir. 1999)); see also Vargas-Colón v. Fundación Damas, Inc., 864 F.3d 14, 23-25 (1st Cir. 2017).  As we laid out before, Mayendía made three arguments before the district court concerning the PSR's recommendation that Counts One and Three should be incorporated into the loss calculation, but failed to raise those arguments even implicitly in his opening brief, only raising them later in his supplemental brief, incorporated by reference from his supplemental brief in support of his bail motion.

Mayendía asks that we excuse the silence in his opening brief because of the initial ambiguity before the district court, as well as the two-appeal timeline because of our initial remand. We decline to do so.  We have accepted arguments raised for the first time in supplemental briefing under exceptional circumstances, such as a substantial change in applicable law, see United States v. Vázquez-Rivera, 407 F.3d 476, 487 (1st Cir. 2005), or even excused waiver when "justice so requires."  United States v. Fields, 823 F.3d 20, 32 n.8 (1st Cir. 2016) (citing United States v. Torres-Rosario, 658 F.3d 110, 116 (1st Cir. 2011)). However, to do either in this case would be inappropriate for two reasons.  First, though our initial remand to the district court

added an additional step to the proceedings, it cannot be said that it was a particularly complicated or unusual one. A remand like the one here is not an exceptional circumstance warranting an exception to our waiver doctrine. See Sindi v. El-Moslimany, 896 F.3d 1, 27-28 (1st Cir. 2018) (listing examples of exceptional circumstances, including when "the inadequately preserved arguments are purely legal, are amenable to resolution without additional factfinding, are susceptible to resolution without causing undue prejudice, are highly convincing, are capable of repetition, and implicate matters of significant public concern"); United States v. Pelullo, 399 F.3d 197, 222 n.30 (3d Cir. 2005), as amended (Mar. 8, 2005) (explaining that the defendant's "proffered justification" for excusal of waiver, "the complexity of the case, with its voluminous record and myriad factual and legal questions," was "less than compelling"). Second, Counts One and Three were very visible on the horizon to Mayendía, which we know because he fought to keep them out of the guidelines calculation before the district court at sentencing, arguing that they could not be considered because "[t]here ha[d] been no such finding by a jury or admission by defendant" relating to those counts, and explained in both his first bail brief and his opening appellate brief that the PSR's loss calculation was based on the sum of the down payments from all three counts. See United States v. Koon Chung Wu, 217 F. App'x 240, 246 n.4 (4th Cir. 2007)

(unpublished) (finding defendant's argument raised for the first time on appeal waived "because this argument was readily available to him at the time he filed his opening brief"). In other words, lacking any notable exceptional circumstance and given Mayendía's clear awareness that the issue of loss calculation from Counts One and Three was a significant issue both below at sentencing and on appeal, we deem Mayendía's argument concerning consideration of Counts One and Three as relevant conduct to be waived.[14]

We now proceed to the second and final comedy of errors Mayendía alleges with the district court's calculation of actual loss--consideration of the value of collateral in his loss calculation.

## B. Subtracting Collateral Value from Loss

### 1. Standard of Review

When we review a sentence, we must ensure that it is "procedurally sound and substantively reasonable." United States v. Dávila-González, 595 F.3d 42, 47 (1st Cir. 2010). Procedural

---

[14] Finding waiver in this case is also warranted because the issue usually must be "highly convincing." Sindi, 896 F.3d at 28. Here, because Mayendía failed to marshal any specific countervailing facts, before the district court or this court, to undercut the PSR's reliance on the indictment, the argument he asks us to consider is not even remotely convincing. See United States v. Cox, 851 F.3d 113, 121-24 (1st Cir. 2017) (affirming finding that uncharged conduct was part of a common course of conduct, scheme, or plan in light of the defendant's generalized objections at sentencing and failure to marshal any specific evidence that would create a genuine issue of fact).

- 13 -

reasonableness includes under its umbrella "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." United States v. Stone, 575 F.3d 83, 89 (1st Cir. 2009). Though Mayendía's argument here invokes a broader question of legal interpretation of the guidelines, fundamentally, his argument concerning the district court's failure to subtract the value of collateral from the loss amount sounds in procedural reasonableness because it is fundamentally an allegation of incorrect guidelines calculation. Normally, "prototypical question[s] of legal interpretation," such as the district court's loss-calculation methodology, are reviewed *de novo*. Cox, 851 F.3d at 124-25 (defining loss-calculation methodology as "a prototypical question of legal interpretation"); see United States v. Foley, 783 F.3d 7, 23 (1st Cir. 2015) (distinguishing "the district court's calculation methodology" from "its mathematical application of this methodology" to conclude same); United States v. Walker, 234 F.3d 780, 783 (1st Cir. 2000) (same). However, unlike the effort he made below to convince the district court to reject Counts One and Three as relevant conduct, Mayendía was as

silent as a neat's tongue dried[15] with respect to either the PSR or the district court's failure to subtract the value of the properties from the loss. Because Mayendía "fail[ed] to make a timely assertion of a right" we find that he forfeited this argument.[16] Rodriguez, 311 F.3d at 437.

Accordingly, we review the district court's failure to subtract collateral property value from the loss for plain error. Under plain error review, Mayendía must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Marchena-Silvestre,

---

[15] William Shakespeare, The Merchant of Venice act 1, sc. 1.

[16] In addition to forfeiture, the government argues that Mayendía waived this argument by conceding in the plea agreement and at the sentencing hearing that the loss related to Count Two could be as high as $140,000, the loan amount from Count Two, because the PSR clearly used the down payments and, on a per-count basis, its calculation satisfied this condition. Even considering Mayendía's failure to object to the PSR in a favorable light, the PSR put Mayendía on notice that use of the down payments was a possible (and recommended) basis for the loss calculation. At a minimum a defendant is expected to offer "_any_ objections, including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the [PSR]" within 14 days of receiving it. Fed. R. Crim. P. 32(f)(1) (emphasis added). Given the clear failure to object below, we need not determine whether Mayendía waived, rather than merely forfeited, this argument. Furthermore, as we explain, even when we apply the more defendant-friendly standard of plain error and review the merits of Mayendía's argument, he fails to demonstrate any error showing prejudice or harm.

802 F.3d 196, 200 (1st Cir. 2015) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)).

After reviewing the record, we espy no plain error.

## 2. Loss Calculation Methodology: A Primer

Before we begin our analysis, a loss calculation soliloquy should help us approach this issue trippingly on the tongue.[17] Guidelines calculations for crimes including false statements on a mortgage loan application are ratcheted up according to, among other factors not relevant in Mayendía's case, the monetary loss attributable to the defendant's crime. U.S.S.G. § 2B1.1(b)(1). Loss can take one of two forms: "actual loss" or "intended loss," and must be the larger of the two in each case. U.S.S.G. § 2B1.1 app. n.3(A).[18] Actual loss, our relevant category here, is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 app. n.3(A)(i). "Reasonably foreseeable pecuniary harm" includes "pecuniary harm that the defendant knew, or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 app. n.3(A)(iv).

---

[17] See William Shakespeare, Hamlet act 2, sc. 2.
[18] Though not relevant in Mayendía's case, we note that in addition if either of these two loss pathways are too difficult to traverse, the district court can determine "the gain that resulted from the offense as an alternatie measure of loss." U.S.S.G. § 2B1.1 app. n.3(B).

- 16 -

The guidelines provide the district court with broad discretion to determine this number. The district court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 app. n.3(C). Furthermore, the guidelines note that "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based on that evidence" and thus "is entitled to appropriate deference." Id. And when making that estimate, it need only be "based on available information, taking into account, as appropriate and practicable under the circumstances," numerous specific and general factors, including the fair market value of the relevant property. Id. Fundamentally, loss calculations must reflect "the seriousness of the crime and the relative culpability of the offender." United States v. Alphas, 785 F.3d 775, 783 (1st Cir. 2015).

But, in seeming tension with section 2B1.1's general objective of achieving a reasonable estimate under the particular circumstances of the case, the district court's approach is cabined by a number of specific exceptions and inclusions it should consider when constructing its calculation methodology. One of those considerations, central to Mayendía's appeal, is application note 3(E), which says that "[l]oss *shall* be reduced by," U.S.S.G. § 2B1.1 app. n.3(E) (emphasis added), among other things:

> [in] the case of a fraud involving a mortgage
> loan, if the collateral has not been disposed
> of by the time of sentencing, us[ing] the fair

market value of the collateral as of the date on which the guilt of the defendant has been established, whether by guilty plea, trial, or plea of nolo contendere. In such a case, there shall be a rebuttable presumption that the most recent tax assessment value of the collateral is a reasonable estimate of the fair market value.

U.S.S.G. § 2B1.1 app. n.3(E)(iii) (application note 3(E)(iii)).

Mayendía is not the first defendant in our circuit to require a district court to do the math of mortgages. In a prior case affirming a district court's methodology to calculate loss from a crime subject to U.S.S.G. § 2B1.1 involving a mortgage loan and a serial mortgage fraudster who used straw purchasers to flip properties, we held that "actual loss usually can be calculated by subtracting the value of the collateral -— or, if the lender has foreclosed on and sold the collateral, the amount of the sales price -— from the amount of the outstanding balance on the loan." United States v. Appolon, 695 F.3d 44, 67 (1st Cir. 2012). After Appolon, we affirmed the application of this formula by other district courts. See Cox, 851 F.3d at 124-25; Foley, 783 F.3d at 23-24 (affirming use of mortgage principal as baseline for actual loss where omissions about down payments "implie[d] Foley's awareness that the lenders would not have advanced the funds to borrowers with no skin in the proverbial game" who "presented a greater risk of default").

The preference for this "loan amount minus fair market value of collateral" methodology makes a great deal of sense. When a bank is the victim of a false statement or fraud related to a mortgage loan, the bank has been induced to issue a loan it would not otherwise have issued, and thus has lost the value of the loan minus whatever it can recoup from the sale of the collateral, or has already recovered through reduction of the loan principal. See, e.g., Foley, 783 F.3d at 23-25 (discussing how, under the Appolon approach, defendant could reduce actual loss by introducing actual figures for fair market value of collateral and principal repayments).

By contrast, down payments will often fail to accurately capture the victim-bank's loss. As a conceptual matter, because a down payment is never sent to the bank, but rather to the seller, its only value to the bank is as criteria to help in determining whether to issue a mortgage loan. See United States v. Brandon, 17 F.3d 409, 427 n.15 (1st Cir. 1994) (explaining that bank fraud statute was satisfied because defendants' "down payment scheme victimized [the bank] because it devalued the mortgages that the bank was providing," and had the bank known that no down payments had been made, the bank would have "refused to provide" those mortgages). And as a practical matter, at least in cases analogous to Appolon or its progeny where application note 3(E)(iii) is applicable, because the down payment is a static number, and fails

to accurately capture the particular market and fact-based circumstances that might mitigate or aggravate a bank's losses, such as a fluctuation in housing prices or loan principal repayments, the district court's decision to adopt one approach over the other can have material effects on the guideline range.[19] For these reasons, absent some rationale by the district court supported by factual or evidentiary circumstances in a particular case involving a mortgage loan, using down payments as the lodestar

---

[19] We explain by way of an example and, apologizing in advance, some judicial arithmetic. Take Count Two, the count of conviction. As we described before, Mayendía admitted in pleading guilty to Count Two that his father received a mortgage for $140,000, having stated to the bank that he had made a $46,481.60 down payment on that property. According to data from the Federal Housing Finance Agency, we can estimate that from the time Mayendía's father executed the mortgage related to Count Two (4Q 2008) and when he pled guilty (3Q 2016), housing prices in Puerto Rico fell by approximately 13.47%. See Federal Housing Finance Agency, All-Transactions House Price Index for P.R., available at www.fhfa.gov/DataTools/Downloads/Documents/HPI/HPI_AT_pr.xls. Based on an approximate total cost for the property of $175,000 when it was purchased in 2008, we estimate that the value of the property when Mayendía pled guilty in 2016 was about $151,427. Other sources have estimated a 44.5% drop in Puerto Rico housing prices since 2010. See Zillow, Puerto Rico Home Prices & Values January 2010-April 2018, available at www.zillow.com/pr/home-values/. This sharper downturn in prices would result in an approximate value of $97,125. Thus, depending on the bank's actual posture given market fluctuations, a loan-amount-based approach that considers value of the collateral would result in an offense-level increase of between zero and six levels, adjusting depending on how much value the bank can recoup from foreclosure sale, see U.S.S.G. § 2B1.1(b)(1)(A), (D); while on the other hand, the down-payment-based approach results in a static six-level increase, even if the bank has lost no money, or has even turned a profit from the foreclosure. See U.S.S.G. § 2B1.1(b)(1)(D).

for the calculation of actual loss runs the risk of failing to reasonably estimate the loss.

"Marry, this is the short and the long of it."[20]  We now turn to the particulars of Mayendía's appeal.

### 3. The Plain Error Gauntlet

Mayendía argues that the district court committed plain error by not applying application note 3(E)(iii) to subtract the fair market value of the properties related to Counts One, Two, and Three from the actual loss.  Mayendía's argument begins and ends with the word "shall" in application note 3(E)(iii).  To hear Mayendía's side, application note 3(E)(iii) mandates that loss from a crime involving a mortgage loan must be reduced by the value of the undisposed collateral--no ifs, ands, or buts.  Taking to heart the maxim that "[t]he simplest way to decide a case is often the best," Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 248 (1st Cir. 2013) (quoting Chambers v. Bowersox, 157 F.3d 560, 564 n.4 (8th Cir. 1998)), we assume for the purposes of this case that, given the plain meaning of the text and the problems with a down-payment-based approach as explained above, the district court committed a clear or obvious error by failing to heed application note 3(E)(iii), especially in the absence of a persuasive reason in the record for finding that the down payments were an

---

[20] William Shakespeare, The Merry Wives of Windsor act 2, sc. 2.

alternative reasonable estimate of the loss, and jump to the question of Mayendía's substantial rights, i.e., whether the error prejudiced him. Setting the attractions of his appeal's good parts aside, Mayendía has not carried his burden on this issue.[21]

As we mentioned before, the clear or obvious error must have affected the defendant's substantial rights to satisfy plain error review. An error affects the defendant's substantial rights when "in the ordinary case [] he or she [can] 'show a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." Molina-Martinez v. United States, 136 S. Ct. 1338, 1343 (2016) (quoting United States v. Dominguez Benitez, 542 U.S. 74, 76, 82 (2004)). In Molina-Martinez, the Supreme Court held that a defendant can satisfy this burden by "pointing to the application of an incorrect, higher Guidelines range and the sentence he received thereunder." Molina-Martinez, 136 S. Ct. at 1347.

Since Molina-Martinez, the Supreme Court has made clear the importance of the particularity of the showing a defendant must make under the substantial-rights prong of plain-error review. In the Court's recent decision in Rosales-Mireles v. United States, 138 S. Ct. 1897 (2018), the defendant identified for the first time on appeal that his PSR had mistakenly double-

---

[21] See William Shakespeare, The Merry Wives of Windsor act 2, sc. 2.

counted a prior conviction, and that the mistake resulted in a change to his criminal history category that increased his guidelines range from 70-87 months to 77-96 months. Id. at 1905. The Court confirmed that showing "an error resulting in a higher range than the Guidelines provide usually establishes a reasonable probability" that the defendant will serve a harsher sentence, affecting his substantial rights. Id. at 1907. The Court then concluded that, in the case of a defendant who has made that showing of prejudice, "[i]n the ordinary case . . . the failure to correct a plain Guidelines error that affects a defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings." Id. at 1911. In other words, the Supreme Court has said, and reaffirmed recently, that when appealing a guidelines calculation error under plain error review, a defendant-appellant must show that the error he has meritoriously identified, rather than some other issue in the case, satisfies the substantial rights prong.

In this case, where the relevant error affecting the guideline range was the failure to subtract the fair market value of the collateral as a part of the loss calculation, Mayendía must point to facts that, had the court considered them below or were the court to consider them on remand, would allow the court to reach a specific lower (and correct) guidelines range. Mayendía has not done that.

Across all of his briefing, and reinforced at oral argument, Mayendía focuses on the fact that failure to consider the fair market value of the collateral was error, but does not advance any argument that if *that* error were cured, he would be entitled to a lower applicable guideline range. As application note 3(E)(iii) itself points out, this could be done with as little evidence as the "most recent tax assessment value of the collateral," which creates a "rebuttable presumption" that the tax assessment value is "a reasonable estimate of the fair market value." U.S.S.G. § 2B1.1, app. n.3(E)(iii). Though it is his burden to demonstrate plain error here, Mayendía does not proffer the tax assessments of the properties, nor does he point to any other number in the record relevant to the subtraction of the fair market value of collateral, much less an alternative proposed loss quantity, that would allow us to find that his substantial rights were affected. See Foley, 783 F.3d at 25 (rejecting defendant's argument as "no more than mere speculation" because he "offer[ed] no figure" to show "that these [loan principal] repayments . . . bring[] him into a lower Guidelines range[]"). By not doing so, Mayendía has failed to articulate an argument about any "applicable . . . Guidelines range" much less "an incorrect, higher" one. Molina-Martinez, 136 S. Ct. at 1346.

The only number Mayendía does identify to support his argument that his substantial rights were affected by the district

court's error is $140,000--the loan amount from Count Two. In his plea agreement, Mayendía stipulated with the government to a proposed loss of $95,000-$150,000 based on this amount. According to Mayendía, because it would have been within the district court's discretion to adopt the plea agreement's recommendation, and $140,000 is lower than the $409,129.97 loss amount the district court found, his burden is satisfied. Not so. The loss amount of $140,000 that Mayendía and the government jointly proposed in the plea agreement based only on Count Two does not mention the subtraction of collateral, the error Mayendía appeals here. Rather, the $140,000 amount would only be salient if Mayendía had persuasively argued that the district court had erred by considering Counts One and Three as related conduct when calculating the loss. As we explained above, he has waived this issue and thus did not. In other words, to endure "the slings and arrows" of plain error review,[22] Mayendía must, and cannot, identify an applicable, correct, and lower actual loss calculation absent the clear or obvious error in his case.[23] See Molina-Martinez, 136 S. Ct. at 1345-46.

---

[22] William Shakespeare, Hamlet act 3 sc. 1.

[23] To the extent Mayendía argues in the alternative that the fair market value of the collateral should have been subtracted from the down payments to satisfy application note 3(E)(iii), we take a brief detour here to explain the infirmity of that argument before the final curtain. As we explained in the primer, the district court's top-level objective when calculating loss is to

Though "the better part of valor is discretion," the better part of substantial-rights analysis under plain error review is specificity.[24]  Falstaff would fail to satisfy plain error review, and so does Mayendía.  Thus, even if the court erred, it did not do so plainly.

### III. Conclusion

Peace! We stop our mouths,[25] and **affirm.**

**-Dissenting Opinion Follows-**

---

make a "reasonable estimate of the loss."  U.S.S.G. § 2B1.1 app. n.3(C).  Had the district court subtracted the fair market values of the properties from the down payments, the resulting numbers would be negative, and thus certainly unreasonable.  Taking Count Two as an example again, under this formula the home value ($97,125, or even higher) would be subtracted from the down payment ($46,481.60).  The absurdity of this result leads us to the obvious conclusion that this would not be a reasonable estimate of the loss, and thus, would not satisfy the substantial-rights prong of plain error review because the alternative proposed loss calculation (and thus guidelines range) would be neither applicable nor correct.

[24] William Shakespeare, Henry IV Part I act 5, sc. 4.
[25] William Shakespeare, Much Ado About Nothing act 5, sc. 4.

**KAYATTA, Circuit Judge, dissenting.** I respectfully dissent.

The record contains one proper basis for calculating loss: The parties' joint stipulation that the loss on the second transaction was more than $95,000 but less than $150,000. Neither the stipulation nor the record as a whole offered any basis to calculate any loss at all for the other two transactions. So Mayendía made a very simple point below and on appeal: "At the sentencing hearing defense counsel correctly and consistently argued that there was nothing in the record which would warrant a loss higher than the stipulated loss agreed to with the government." Had the district court acknowledged the correctness of this argument, Mayendía's guideline sentencing range would have been lower than the range calculated by using the down payment amounts as a proxy for loss.

Rather than confronting this simple argument, the majority opinion recasts it as an argument that the district court's error was "in failing to apply a guidelines application note mandating that district courts subtract the fair market value of unsold collateral from the actual loss." Certainly Mayendía's brief explained how the use of the down payment amounts rather than collateral value was improper under the application note. That explanation buttressed his premise that the court could not equate the down payments to the loss. He also explained why the

record does not contain the collateral values:  Because "the parties jointly recommended to the sentencing court to use the stipulated loss amount . . . ."  But once the district court explained what it did, Mayendía never argued that the court should have obtained and used the collateral values.  To the contrary, he stressed exactly the opposite:  "neither [he] nor the government were [sic] required to present evidence as to the market value of the collateral since none of them were arguing for a loss different than that to which was stipulated."

Having fundamentally recast Mayendía's central and repeatedly asserted argument, the majority not surprisingly finds that the argument as recast was never made below.  Thus armed with plain error review, the majority decrees that Mayendía cannot satisfy the prejudice prong unless he shows that use of the collateral values under the application note methodology would have produced a lower GSR.  And, he cannot do that precisely because he is correct that the record contains no evidence that would have allowed the district court to use the application note methodology.

I would rule, instead, that Mayendía was correct in arguing below and on appeal that the evidence in this record provides no basis other than the stipulation for calculating any loss arising out of the three transactions considered by the district court.  Hence, the district court's unsupportable use of

the down payments to generate a higher loss amount was error (plain or otherwise).  And it prejudiced Mayendía because it produced a higher GSR than would have the maximum stipulated amount.