# United States Court of Appeals
## For the First Circuit

No. 18-1890

UNITED STATES OF AMERICA,

Appellee,

v.

GREISY JIMÉNEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Torruella, Lipez, and Kayatta,
Circuit Judges.

Rosemary Curran Scapicchio for appellant.
Sarah Miron Bloom, Assistant United States Attorney, with
whom Andrew E. Lelling, United States Attorney, was on brief, for
appellee.

December 20, 2019

**KAYATTA**, <u>**Circuit Judge**</u>.    For several years, Greisy Jiménez worked as a real estate broker at Coldwell Banker and simultaneously ran a so-called short-sale negotiation firm known as Foreclosure 911.  In the wake of the financial crisis that began around 2007, the homes of a number of her family members, friends, and clients were no longer worth as much as the debts secured by mortgages on their respective homes.  Jiménez assisted these homeowners and procured fees for herself by fraudulently inducing several banks to agree to short sales of the homes even though, unbeknownst to the banks, the conditions typically required for short sales were not met.  The various homeowners (including Jiménez herself) thus managed to continue living in their homes while reducing their mortgages and avoiding any attempt by the banks to collect deficiencies on the loans.

On this appeal following her guilty plea and conviction on charges of bank fraud and conspiracy to commit bank fraud, Jiménez challenges only the length of her sentence, largely to the extent that her Guidelines sentencing range (GSR) was inflated by what she claims was a flawed estimate of the losses caused by her offense.  For the following reasons, we affirm her sentence.

## I.

Typically, a prospective homeowner borrows a substantial portion of the cost of her new home from a bank.  In return, the bank receives a promissory note obligating the borrower to repay

- 2 -

the loan, plus interest. To secure the note, the bank also receives a mortgage on the home. Problems for all arise when the home value drops below the amount of the outstanding debt on the note, a circumstance often referred to as the property being "underwater."

Sometimes, borrowers and lenders find it in their mutual interest to sell an underwater home for less than the borrower owes on the note. In such a transaction, known as a "short sale," the bank releases its mortgage, receives only the proceeds of the sale, and often forgoes pursuing the borrower for the deficiency on the note. Before agreeing to cut their losses in this way, banks often insist on certain conditions. Those conditions include, among other things, that the sale be at arm's length (that is, between strangers), with the selling homeowner surrendering residency. If the conditions are not met, a bank can refuse to approve the short sale and might well opt to see if the borrower's desire to avoid foreclosure and stay in the home causes the borrower to continue making payments.

In this case, Jiménez convinced at least nine banks to approve short sales of twelve homes owned by Jiménez or her clients, with many of these homes being encumbered by more than one mortgage. But the sales were far from bona fide. Rather, Jiménez recruited straw buyers; used false aliases; and materially falsified on loan and sale documentation the purported buyers'

incomes, the relationships of the purported buyers to the sellers, and the sources of the down payments -- all to dress up loan reductions as short sales. Eventually, the fraud was revealed, and Jiménez was indicted.

Jiménez pled guilty to one count of conspiracy to commit bank fraud and two counts of bank fraud. The presentence investigation report (PSI Report) calculated a base offense level of seven, plus a 16-level enhancement for the amount of loss the scheme caused, see U.S.S.G. § 2B1.1(b)(1)(I), a 2-level enhancement because the scheme involved "sophisticated means," see U.S.S.G. § 2B1.1(b)(10)(C), and a 2-level reduction for acceptance of responsibility, see U.S.S.G. § 3E1.1(a), amounting to a total offense level of 23. Combining the offense level with a criminal history category of I, the PSI Report found a GSR of 46–57 months. The government objected to the PSI Report's failure to include a 4-level enhancement for Jiménez's leadership role in the offense. See U.S.S.G. § 3B1.1(a). For her part, Jiménez objected to, among other things, each enhancement and any contention that she led or organized the scheme.

At sentencing in August 2018, the district court adopted the guidelines calculations in the PSI Report, as well as the leadership enhancement proposed by the government. The district court estimated the loss attributable to Jiménez's scheme according to the probation office's formula: by calculating the

- 4 -

difference between the outstanding loan balances on those properties and their short-sale prices. In this manner, the court found that the scheme caused between $1,500,000 and $3,500,000 in loss, generating a 16-level enhancement. In the alternative, the district court estimated that the participants in the frauds collectively gained approximately the same amount. Based on those findings, Jiménez's total offense level came to 27. This offense level, in combination with a criminal history category of I, produced a GSR of 70–87 months.

Varying downward, the district court sentenced Jiménez to thirty-six months of imprisonment and four years of supervised release, reasoning that letters from Jiménez's friends, family, clients, and colleagues "really d[id] consistently describe a person who ha[d] done very good things for other people," notwithstanding the seriousness of the offense. Jiménez now appeals that below-range sentence, arguing that it was procedurally unreasonable, primarily due to the district court's loss-calculation methodology. Jiménez also challenges the district court's findings that the scheme involved sophisticated means and that she was a leader or organizer of the conspiracy. Finally, Jiménez challenges the substantive reasonableness of her sentence, and she argues that the district court punished her for failing to cooperate with the government, thereby impinging on her Fifth Amendment right against self-incrimination.

We consider first Jiménez's claims that the district court committed procedural errors in calculating her GSR and then turn to her substantive-reasonableness claim.  See United States v. Matos-de-Jesús, 856 F.3d 174, 177 (1st Cir. 2017).  We address Jiménez's Fifth Amendment challenge last.

**A.**

Jiménez challenges each of the three enhancements the district court applied in determining her offense level under the Sentencing Guidelines.  We address each in turn.  In doing so, we "afford de novo review to the sentencing court's interpretation of and application of the sentencing guidelines, assay the court's factfinding for clear error, and evaluate its judgment calls for abuse of discretion."  United States v. Ruiz-Huertas, 792 F.3d 223, 226 (1st Cir. 2015).

**1.**

The most significant issue in this case is whether the district court appropriately held Jiménez responsible for a loss to the lenders of over $1,500,000, a calculation that increased her offense level by 16 under U.S.S.G. § 2B1.1(b)(1), stepping up her total offense level from 11 to 27 and the corresponding GSR from 8-14 months to 70-87 months.

A fraud defendant's total offense level is based in part on the amount of pecuniary loss caused by her conduct.  See

U.S.S.G. § 2B1.1(b)(1); see also United States v. Mayendía-Blanco, 905 F.3d 26, 35 (1st Cir. 2018) (explaining the principles of loss calculation under U.S.S.G. § 2B1.1(b)(1)). The appropriate loss amount is the greater of actual loss or intended loss. U.S.S.G. § 2B1.1 cmt. n.3(A). Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense." Id. § 2B1.1 cmt. n.3(A)(i).

To calculate the loss amount in this case, the district court took the remaining loan amount secured by each mortgage and subtracted the lesser amounts received in the short sales.[1] This formula well fits most cases in which fraud induced the making of the original loan. See, e.g., United States v. Appolon, 695 F.3d 44, 51 (1st Cir. 2012). In such a case, but for the fraud, no loan would have been made. Id. at 66–67. Here, though, the original loans were presumably bona fide, and they were under-secured before the conspiracy was hatched through no fault of Jiménez. So we need to subtly but materially restate the formula by first estimating what the banks would have foreseeably realized

---

[1] The district court adopted these calculations from the PSI Report. Although the Report stated that its loss calculations "represent[ed] the original mortgage amount minus the amount recovered by the bank in short sales," the probation officer confirmed at the sentencing hearing that that was an error and that the figures really represented the outstanding loan amount minus the amount recovered in the short sale.

but for the fraud and then subtracting what they in fact received as a result of the short sales.

Whether this restated formula would have produced a different result from the one the district court used depends on what one thinks would have happened but for the frauds. Note that in Jiménez's scheme, while the mortgage lenders were misled on many aspects of the transactions, there are no allegations that the short sales were based on deflated home values. To the contrary, Jiménez argues that the sales prices were based on official appraisals approved by the original lenders. The government for its part does not argue that any of the short sales realized less than fair market value. We can therefore assume that the original lending banks received roughly the full existing value of their collateral in the short sales. So if, but for the fraudulent short sales, there would have been either a series of legitimate short sales or forced foreclosures for roughly the same or lower prices, the scheme might well have caused no loss.

There was another foreseeable outcome, however: that, but for the fraud, the borrowers, wanting to stay in their homes, would have continued making loan payments such that the banks would have eventually recouped either full repayment or higher sales prices after the property values had rebounded.[2]  Jiménez's

---

[2] In the district court, the government presented evidence that the house values eventually rebounded some.

argument seems to be that this could not have happened because the borrowers were not able to continue making payments in the first place. But there is no substantial evidence either that any of the homeowners had stopped making payments other than as a ploy in the course of the fraud or that they could not continue making payments going forward.[3] Furthermore, the owners apparently wanted to remain in their homes so much that they risked going to prison. Absent any evidence to the contrary, the district court was thus entitled to presume that the status quo ante (making payments) would have foreseeably continued but for the fraud, certainly enough so that the amount that would have been realized by the banks but for the fraud was at least $1,500,000 more than what they did realize. See United States v. Stone, 866 F.3d 219, 226 (4th Cir. 2017) ("[W]ithout any evidence to the contrary, the district court could only speculate as to when (or if) any of these homeowners would cease making mortgage payments."). And in that event the difference between the pre-existing unpaid loan amounts and the short-sale prices would have represented both a gain to the homeowners and a loss to the banks.

Of course, the above only holds assuming that the deficiencies on the original notes were forgiven and the banks did

_____

[3] The government points to interviews with two of Jiménez's co-conspirators, who both reported that she told clients to stop making their mortgage payments so that they would be eligible for short sales. Jiménez does not contest this point.

not recover any amounts beyond the short-sale prices. Jiménez argues that the banks did not formally give up their rights to go after the homeowners for deficiencies on the notes, but the evidence on that point leaves us largely in the dark. Jiménez's objection to the PSI Report, as well as a Rule 28(j) letter she sent after oral argument, tell us that, in the documentation for at least one short sale, the bank reserved a claim for a deficiency. The government contends that the short-sale agreement Jiménez identifies was for the short sale of her own home. The government's 28(j) letter in turn points to a different short-sale agreement, which it says uses opposite language. As most of the short-sale agreements are not in the record before us, we do not know what the general pattern was.

The parties agreed, however, at oral argument that in reality the banks pressed no such claims against any of the conspirators. The time for doing so has now passed under Massachusetts law.[4] That means that none of the conspirators face personal liability for the deficiencies. In fact, the entire scheme seems to have been premised on the foreseeability that events would unfold this way. It is hard to imagine that the conspirators would have gone through with the scheme if they had

---

[4] The Massachusetts statute of limitations for deficiency judgments is two years, Mass. Gen. Laws ch. 244, § 17A, and the frauds took place between 2008 and 2010.

anticipated confronting personal lawsuits for the deficiencies on their notes.  So the conspirators as a group seemingly received a debt reduction (i.e., a gain) of $2,152,420 even though they stayed in their homes.

That was precisely the formula that the district court used to calculate the conspiracy's gain as an alternative to calculating loss.  Although calculating gain as a substitute for loss is only appropriate in limited scenarios, see United States v. Stoupis, 530 F.3d 82, 86 (1st Cir. 2008), Jiménez presses no challenge to the use of gain as a measure of loss on this record under U.S.S.G. § 2B1.1.[5]  Moreover, here the gain to the homeowners serves as a good economic proxy for loss:  what the owners did not pay, the banks did not receive.  All in all, and recognizing that the loss estimate need only exceed $1,500,000 to sustain the 16-level enhancement, we see neither clear nor legal error in the district court's calculations of gain and loss, or in its resulting decision to employ the enhancement.

**2.**

Jiménez next argues that the district court erred in applying a 4-level enhancement for her role in the offense.

---

[5] Her brief on appeal mentions the issue in passing but makes no serious argument on it.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  In any case, she clearly agreed to the use of gain as an alternative measurement at the sentencing hearing.

Specifically, the district court found that she "was an organizer or leader of a criminal activity that involved five or more participants." U.S.S.G. § 3B1.1(a). The Guidelines provide seven factors for evaluating whether a defendant is a leader or organizer, including the defendant's decision-making authority, the nature of the defendant's participation, whether she recruited accomplices, her share of the "fruits of the crime," her involvement in organizing the offense, "the nature and scope of the illegal activity," and the degree of control she exercised over her co-conspirators. Id. § 3B1.1 cmt. n.4. More than one person can be a leader or organizer of a conspiracy. Id.

There was ample evidence on those factors here. Jiménez conceived of the conspiracy, recruited key players who acted at her direction, was the common actor involved in every one of the fraudulent short sales, and received the largest share of the fees generated by the scheme. The evidence on which the district court relied included reports of interviews with Jiménez's co-conspirators, as well as documentary evidence of the transactions. The district court's decision to apply the enhancement was eminently reasonable.

**3.**

Jiménez next argues that the district court erred in applying a 2-level sophisticated-means adjustment under U.S.S.G. § 2B1.1(b)(10). The Guidelines require an upward adjustment of

- 12 -

two offense levels if the offense involved "sophisticated means." Id. § 2B1.1(b)(10)(C). Sophisticated means are "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Id. § 2B1.1 cmt. n.9(B). The conduct must involve some greater level of concealment than a typical fraud of its kind. United States v. Pachecho-Martinez, 791 F.3d 171, 179 (1st Cir. 2015) (requiring "a greater level of planning or concealment than a typical fraud" (quoting United States v. Knox, 624 F.3d 865, 870-72 (7th Cir. 2010))).

The district court determined that Jiménez's conduct went beyond the typical fraud of making misrepresentations on a loan application form (which it characterized as "a conventional way to defraud a bank"), and instead encompassed recruiting individuals to act as straw buyers (which required them to pretend that they were going to live in the short-sold homes), using aliases, and advising mortgagors on whether to continue making their mortgage payments. The evidence on which the district court relied was solid, and the court thus reasonably found that the planning and concealment in this scheme surpassed that required for simple mortgage fraud.

**B.**

Jiménez also contests the substantive reasonableness of her sentence, arguing that it produces unwarranted disparities on two fronts. First, she argues, as she did in the district court,

that the sentence creates unfair disparities between herself and her co-conspirators.  Second, she argues for the first time that the sentence results in unfair disparities between herself and other defendants nationally because the national average sentence for fraud defendants is lower than thirty-six months.

Where a substantive-reasonableness challenge is preserved, we review for an abuse of discretion.  Matos-de-Jesús, 856 F.3d at 179.  The standard of review for unpreserved challenges is "somewhat blurred," so here we avoid the issue and give the benefit of the doubt to the defendant, applying an abuse-of-discretion standard.  United States v. Alejandro-Rosado, 878 F.3d 435, 440 (1st Cir. 2017) (citing United States v. Márquez-García, 862 F.3d 143, 147 (1st Cir. 2017)).

A reasonable sentence is one driven by a "plausible sentencing rationale" with a "defensible result."  United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008).  The standard affords significant discretion to the district court, because "in most cases there is not a single appropriate sentence, but rather a universe of reasonable sentences."  Alejandro-Rosado, 878 F.3d at 440 (quoting United States v. Rivera-González, 776 F.3d 45, 52 (1st Cir. 2015)).

Jiménez's challenge to the substantive reasonableness of her sentence starts out with little prospect for success.  The thirty-six-month sentence is well below the guidelines range.  See

United States v. King, 741 F.3d 305, 310 (1st Cir. 2014) ("It is a rare below-the-range sentence that will prove vulnerable to a defendant's claim of substantive unreasonableness."); see also United States v. Floyd, 740 F.3d 22, 39–40 (1st Cir. 2014) ("When . . . a district court essays a substantial downward variance from a properly calculated guideline sentencing range, a defendant's claim of substantive unreasonableness will generally fail."). The argument that Jiménez's sentence should not substantially exceed her co-conspirators' fares little better: "Congress's concern [with unwarranted disparities] was mainly with minimization of disparities among defendants nationally rather than with disparities among codefendants engaged in a common conspiracy." United States v. Vargas, 560 F.3d 45, 52 (1st. 2009).

In any event, the sentencing court reasonably concluded that Jiménez was more culpable than her co-conspirators, in part because she brought them into the scheme in the first place, and also because they cooperated with the government while she did not. Jiménez also has not offered evidence that would show that her circumstances are sufficiently similar to the national median fraud defendant to create a meaningful point of comparison. As a result, she can point to no relevant disparity that might render her sentence substantively unreasonable.

## c.

Finally, Jiménez argues that the district court's explanation of her co-conspirators' lower sentences shows that it punished Jiménez for not cooperating with the government and thus both penalized her for exercising her Fifth Amendment rights and violated the Sentencing Guidelines. See U.S.S.G. § 5K1.2 (prohibiting use of "refusal to assist authorities" as an aggravating factor). These arguments were not raised below, and Jiménez has provided no explanation for why they should not be considered forfeited. While preserved claims of constitutional sentencing error are reviewed de novo, United States v. Platte, 577 F.3d 387, 391 (1st Cir. 2009), most unpreserved claims are reviewed for plain error, see United States v. Zarauskas, 814 F.3d 509, 514–15 (1st Cir. 2016) (reviewing an unpreserved Fifth Amendment claim for plain error).

Either way, the claim has no merit. The district court did not punish Jiménez for not cooperating; it simply explained to her why her sentence was higher than those of her co-conspirators who did cooperate. Our precedent is clear that sentencing courts are permitted to hand down shorter sentences to those who cooperate and show remorse. United States v. Cruzado-Laureano, 527 F.3d 231, 237 (1st Cir. 2008) (remorse); United States v. Miller, 589 F.2d 1117, 1139 (1st Cir. 1978) (cooperation).

### III.  Conclusion

For the foregoing reasons, we <u>affirm</u> Jiménez's sentence.